UNITED STATES of America,
Plaintiff–Appellee,

v.

Salvatore G. MONTELEONE,
Defendant–Appellant.

No. 95–1994.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1995.

Decided Feb. 29, 1996.

John R. Osgood, Lee's Summit, Missouri, argued for appellant.

Bruce E. Clark, Asst. U.S. Attorney, Kansas City, Missouri, argued for appellee.

Before McMILLIAN, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

Salvatore Monteleone raises numerous challenges to his conviction for disposing of a firearm to a convicted felon in violation of 18 U.S.C. § 922(d)(1) (1994). Because the prosecutor posed wholly improper questions to a defense character witness, we reverse.

## I. BACKGROUND

This case involves the regrettable tale of Salvatore Monteleone, a thirty-four year veteran of the Kansas City, Missouri Fire Department with a previously unblemished criminal record, whose association with a knavish relative ultimately led to his conviction in federal court.

On November 4, 1993, Arlie Brown, a convicted felon and suspected dealer of narcotics and illegally obtained weapons, offered to sell a .45 caliber pistol to Donna Lierz, an undercover agent working for the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Federal officials subsequently executed a search warrant on Brown's residence and found, among other things, a .45 caliber handgun under a pillow in Brown's bedroom. On April 22, 1994, Monteleone, Brown's half brother, submitted to the ATF a petition for remission declaring his ownership of the seized gun and asking to have it returned to him. As part of the normal procedure for dealing with remission petitions, Special Agent Lierz scheduled a meeting with Monteleone to discuss his claim.

During this interview, Monteleone, a citizen of Missouri, stated that he purchased the gun from Skip Pruitt, a Kansas resident, in April of 1990. Monteleone claimed that soon after he bought the gun, he discovered that it sometimes jammed when fired. He subsequently informed Brown, a person known by Monteleone to be a "career criminal," about the malfunction, and Brown advised his half brother to have the weapon repaired at the Sure–Shot Gun Shop. Monteleone took the gun to the recommended store, where it was eventually seized during an ATF raid; Monteleone reacquired the handgun in April of 1993.

Monteleone also told Special Agent Lierz that the gun continued to misfire after he retrieved it from Sure–Shot's new owners. When Monteleone advised Brown of the ongoing difficulties, Brown reportedly offered to take possession of the gun and assume responsibility for the repairs. Monteleone again heeded Brown's advice, which led this time to even less successful results. As mentioned above, federal officials confiscated the weapon after Brown offered to sell it to an undercover agent.

The Government later returned a one count indictment against Monteleone, charging him with violating 18 U.S.C. § 922(d) by disposing of a firearm to a convicted felon. At the trial, Albert Lowe, a fire fighter who had worked with Monteleone for almost twenty years, testified that the defendant possessed a good community reputation for truthfulness and lawfulness. During cross-examination, over defense objections, the prosecutor inquired whether Lowe had heard that in the early 1970s Monteleone had perjured himself before a federal grand jury. The court submitted the case to the jury later that same day, and the panel voted in favor of a conviction. The district judge thereafter sentenced Monteleone to twenty-seven months in prison.

In this appeal, Monteleone alleges that: 1) the district court committed error by allowing the Government to pursue an inappropriate line of questioning during cross-examination of his character witness; 2) 18 U.S.C. § 922(d)(1) unconstitutionally exceeds Congress' legislative authority under the Commerce Clause; and 3) the district court's jury instructions contained an erroneous defini-

tion of the term "dispose." Although only the first of these contentions requires reversal, we will address the other claims because they are likely to appear during a retrial. We will not, however, consider Monteleone's objections to the district court's application of the sentencing guidelines, as reversal renders those arguments moot.

## II. DISCUSSION

### A. Character Evidence under Rule 405(a)

■ Monteleone maintains that the district court committed reversible error when it permitted the prosecutor to question Albert Lowe concerning his knowledge of allegedly perjurious statements that Monteleone made before a federal grand jury.[1] The district court has broad discretion in determining the propriety of impeaching questions to character witnesses, and we will not reverse unless there has been a "clear showing of prejudicial abuse." *Mullins v. United States*, 487 F.2d 581, 587–88 (8th Cir.1973).

■ The modern rules governing the admissibility of character evidence at trial are counterintuitive and enigmatic vestiges of an ancient time when expositions upon the defendant's moral disposition were commonplace in criminal proceedings. *See* 1A Wigmore, Evidence § 58.2, at 1213 & n. 1 (Tillers rev. 1983). Generally, the contemporary rules prohibit the Government from introducing evidence of the defendant's immoral character in an attempt to establish his propensity to engage in criminal behavior. Fed. R.Evid. 404; *Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948). Character evidence is undeniably relevant in determining probabilities of guilt, however, and for this reason the defendant is free to present evidence, in the form of opinion or reputation testimony, of pertinent favorable character traits. Fed. R.Evid. 404(a)(1), 405(a); *Michelson*, 335

U.S. at 476, 69 S.Ct. at 218–19. Where the defendant chooses this perilous path, though, he opens the door for the prosecution to introduce in rebuttal its own opinion or reputation evidence regarding the defendant's character. Fed.R.Evid. 404(a)(1), 405(a). Furthermore, the Government may challenge the defendant's character witnesses by cross-examining them about their knowledge of "relevant specific instances" of the defendant's conduct. Fed.R.Evid. 405(a).

■ This "specific act" cross-examination of a defendant's reputation witness is allowed not for the purpose of proving that the defendant committed the particular bad acts, but rather is permitted so that the Government may "test the knowledge and credibility of the witness." *Gross v. United States*, 394 F.2d 216, 220 (8th Cir.1968). " 'The rationale given for allowing such questions is that, if answered affirmatively, they might cast serious doubt on the witness's testimony, thus serving a legitimate rebuttal function, and that, if answered negatively, they would show that the witness did not know enough about the accused's reputation to testify.' " *Awkard v. United States*, 352 F.2d 641, 643 n. 4 (D.C.Cir.1965) (quoting Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters*, 70 Yale L.J. 763, 779 (1961)).

■ Though this cross-examination serves genuine impeachment purposes, we have previously recognized that the process "is fraught with great danger." *Gross*, 394 F.2d at 219. "[U]nless circumscribed by rules of fairness and grounded in demonstrated good faith on the part of the prosecution, the result could be most prejudicial to the defendant and make for a miscarriage of justice." *United States v. Krapp*, 815 F.2d 1183, 1186 (8th Cir.), *cert. denied*, 484 U.S. 860, 108 S.Ct. 174, 98 L.Ed.2d 127 (1987). Accordingly, the Government must meet two important

---

1. The disputed exchange proceeded as follows:

Q. My question to you was, have you heard that [Monteleone] had testified before a federal grand jury and lied under oath about his involvement in an illegal narcotics importation?

A. No, sir.

Q. Would your opinion as to his reputation for truthfulness change if you knew that he

had, in fact, lied about his importation of narcotics to a federal grand jury?

A. Would you clarify that?

Q. Yes. Would your opinion as to his reputation for being truthful change if you knew that he had, in fact, lied under oath before a federal grand jury about narcotics importation?

A. Yes, I guess.

requirements before utilizing this type of questioning. First, the Government must demonstrate a good faith factual basis for the incidents raised during cross-examination of the witness. *United States v. Adair,* 951 F.2d 316, 319 (11th Cir.1992). Secondly, the incidents inquired about must be relevant to the character traits at issue in the case. *Id.*

▇▇ In the instant case, the Government argues that it believed in good faith that Monteleone lied before a federal grand jury. While that may be true,[2] it does not in itself suffice to satisfy the first prerequisite mentioned above. Given the traditional justification for allowing "specific act" cross-examination, which is to test the reliability and credibility of the reputation witness, the prosecutor must do more than simply establish a "good faith belief that the incidents to which the questions alluded actually occurred." *Mullins,* 487 F.2d at 585 n. 1. In addition, the prosecutor must possess a good faith belief that the described events are of a type "likely to have become a matter of general knowledge, currency or reputation in the community." *United States v. Duke,* 492 F.2d 693, 696 (5th Cir.1974); *see also Michelson,* 335 U.S. at 479, 69 S.Ct. at 220 (stating that the prosecution may permissibly ask questions concerning events "about which people normally comment and speculate"); *United States v. Curtis,* 644 F.2d 263, 268 (3d Cir.1981) ("[During cross-examination of a reputation witness], inquiry may be made about conduct, and even about charges, which may have come to the attention of the relevant community."); *People v. Eli,* 66 Cal.2d 63, 56 Cal.Rptr. 916, 926, 424 P.2d 356, 366 (en banc) ("The prosecution [in cross-examination] ... may disclose rumors, talk, and reports circulating in the community."), *cert. denied,* 389 U.S. 888, 88 S.Ct. 136, 19 L.Ed.2d 188 (1967). For, if the suggested occurrences were essentially private in nature and not likely to have been known in the community at large, then the questions can-

not possibly be intended "to test the accuracy, reliability, or credibility of the [reputation witness's] testimony." *Awkard,* 352 F.2d at 645. Rather, the queries "serve[ ] only to prejudice the defendant by the introduction of past offenses." *Id.; see also* 22 C. Wright & K. Graham, Federal Practice and Procedure § 5268, at 620 (1978) ["[P]rivate conduct not likely to be known in the community would seem to be irrelevant...."].

Here, we cannot say that the Government had a good faith basis for believing that Monteleone's conduct before a federal grand jury was likely to have been known in the relevant community. Instead, it appears patently unlikely that the public would have become aware of Monteleone's testimony. As the prosecutor should have known, "the testimony of a witness before a federal grand jury is protected by an obligation of secrecy under court supervision." *In re Long Visitor,* 523 F.2d 443, 447 (8th Cir.1975); *see also* Fed.R.Crim.P. 6(e)(2). Indeed, it would have been highly improper for grand jurors or federal officials to comment publicly about Monteleone's mere presence before the grand jury. *United States v. White Ready–Mix Concrete Co.,* 509 F.Supp. 747, 750 (N.D.Ohio 1981) (finding that Rule 6(e) prohibits disclosure of witnesses appearing before a grand jury). Consequently, the only legitimate source of any rumors pertaining to Monteleone's testimony before the jury would have been Monteleone himself, and we seriously doubt that he would blazon his own prevarication. *See Duke,* 492 F.2d at 696 (noting that it is improbable to believe a person would release his own criminal conduct "for general consumption").

▇▇ Because the Government did not demonstrate a good faith basis for believing that Monteleone's alleged perjury was likely to have been a topic of discussion in the relevant community, the district court abused

---

2. Then again, it may not be. We note that the "truth" is often a matter of degrees and only rarely appears in absolute terms. A statement that appears untruthful to an observer can regularly be explained by its proponent as completely consistent with the facts. Although the prosecutor offered to submit to the district court materials "proving" that Monteleone committed perju-

ry, there is no indication that the district court required him to do so. To date, then, it appears that there has been no independent judicial inspection of the information tendered by the prosecutor. It is telling to us that Monteleone evidently was never indicted for his allegedly perjurious conduct.

its discretion when it allowed the prosecutor to broach this subject during cross-examination of Lowe. As we are unable to find that the error did not affect Monteleone's substantial rights, we must reverse. *See* Fed. R.Crim.P. 52(a). We have already noted that cross-examination of a reputation witness about a defendant's specific bad acts can be extremely inflammatory and prejudicial. This is especially true where, as here, the prosecutor in a single strike implies that the defendant is both an uncharged criminal and an unprincipled liar. In fact, Monteleone, who was the only defense witness other than Lowe, took the stand in his own defense only minutes after the prosecutor's inappropriate remarks. Given the prosecutor's ability to "waft an unwarranted innuendo into the jury box," *Michelson*, 335 U.S. at 481, 69 S.Ct. at 221, we think it entirely possible that the improper questions effectively negated Monteleone's testimony. It is hard to imagine anything more damaging happening during a criminal trial.

There was unquestionably sufficient evidence supporting the jury's verdict, and we take no pleasure in overturning Monteleone's conviction. We are simply unable to conclude that the error had "only a slight influence," *United States v. Big Crow*, 74 F.3d 163, 166 (8th Cir.1996), on the verdict. *See United States v. Reed*, 700 F.2d 638, 646–47 (11th Cir.1983) (reversing conviction despite "substantial evidence" of defendant's guilt); *United States v. Curry*, 512 F.2d 1299, 1305 (4th Cir.) ("The probability that [the improper admission of character evidence] unduly influenced the jury and denied [the defendant] a fair trial is so great that we cannot treat the error as harmless."), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975). Moreover, though the district court apparently gave a cautionary instruction advising the jury of the limited purpose for which the questions were permitted, that measure was insufficient in this case to cure the fatal defect. As our colleagues on the District of Columbia Circuit have observed, "Cautionary instructions ... do not [always] give the accused adequate protection. They cannot prevent the jury from considering prior actions in deciding whether appellant has committed the crime charged." *Awkard,*

352 F.2d at 645–46. We consequently feel compelled to reverse Monteleone's conviction, and we now turn to those issues that are likely to appear during any subsequent retrial.

## B. Constitutionality of 18 U.S.C. § 922(d)

■ Relying on the United States Supreme Court's recent decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Monteleone asserts that 18 U.S.C. § 922(d) exceeds Congress' legislative authority under the Commerce Clause. This is a legal determination, and it is therefore subject to de novo review. *United States v. Brown*, 72 F.3d 96, 96 (8th Cir.1995).

The provision applicable to this case is section 922(d)(1), which makes it unlawful:

> for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person ... is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year.

18 U.S.C. § 922(d)(1) (1994). We acknowledge that section 922(d) does not contain any jurisdictional element which limits its scope to those offenses affecting interstate commerce, and it could thus be applied to wholly intrastate transactions. Still, we do not feel that the statute is rendered unconstitutional by the Supreme Court's narrow holding in *Lopez.*

■ The *Lopez* decision recognized Congress' power under the Commerce Clause to regulate three types of activity. First, Congress may pass legislation regulating "the use of the channels of interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629. Additionally, Congress has the capacity "to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* Lastly, Congress' commerce power includes the ability to regulate activities that substantially affect interstate commerce. *Id.* at ——————, 115 S.Ct. at 1629–30. Like

the statute at issue in *Lopez,* section 922(d) can be justified only under the third category of Congress' commerce power.

*Lopez,* though, involved a law proscribing the simple *possession* of a gun within a school zone, an endeavor that "has nothing to do with 'commerce' or any sort of economic enterprise." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630–31. By contrast, section 922(d) addresses the *disposal* of firearms, which is an inherently commercial activity. *See United States v. Lopez,* 2 F.3d 1342, 1354 (5th Cir.1993) ("[A]cquisition of firearms is more closely related to interstate commerce than mere possession."), *aff'd,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). This conclusion is supported by explicit Congressional findings.

Congress initially enacted the legislation containing section 922(d) because it was concerned about "a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce." Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 901(a)(1), 82 Stat. 197, 225 (1968). In its original form, though, section 922(d) applied only to licensed federal firearms dealers and manufacturers. This restriction created a loophole "whereby qualified purchasers ... acquired firearms from licensees on behalf of prohibited persons." H.R.Rep. No 495, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 1327, 1343 (Assessment by the Bureau of Alcohol, Tobacco, and Firearms). To prevent this abusive practice, which obviously had a negative impact on attempts to regulate the firearms trade, Congress in 1986 amended the statute's prohibition so that it included "any person," not just licensed federal firearms dealers and manufacturers. *See* 18 U.S.C. § 922(d)(1) (1994). Given this brief historical background, it is clear to us that section 922(d) is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631.

■ Furthermore, the disposal of a firearm (as distinguished from the factual circumstance of possession presented in *Lopez* ), even when consummated in a completely intrastate transaction, is a commercial activity "that might, through repetition elsewhere, substantially affect ... interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1634. As such, we determine that section 922(d) represents a legitimate exercise of Congress' commerce power.

#### C. "Disposal" under § 922(d)

■ Under section 922(d), it is illegal for a person to "sell or otherwise dispose" of a firearm to certain disqualified individuals. This case clearly does not involve a sale, and Monteleone claims that the district court erroneously instructed the jury on the definition of "dispose." We review the district court's formulation of jury instructions for an abuse of discretion and will not reverse if the instructions, taken as a whole, fairly and adequately submitted the issues in the case to the jury. *Transport Ins. Co. v. Chrysler Corp.,* 71 F.3d 720, 723 (8th Cir.1995).

■ The district court informed the jury that "the term 'dispose of' as used in the indictment means to transfer a firearm so that the transferee acquires possession of the firearm." This definition of "dispose" is in accord with the Supreme Court's decision in *Huddleston v. United States,* 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974). There, in considering the very language before us in this appeal, the Court determined that a disposal occurs when a person "comes into possession, control, or power of disposal of a firearm." *Id.* at 823, 94 S.Ct. at 1268 (quotation omitted). It is evident, then, that the district court properly instructed the jury on this point.

### III. CONCLUSION

Because the district court committed prejudicial error by allowing the prosecutor to ask improper questions during cross-examination of a defense character witness, we reverse and remand for proceedings consistent with this opinion.

REVERSED.