# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-4081SD
_____

United States of America,

        Appellee,

v.

Merlin J. Bruguier, Sr.,

        Appellant.

\*   On Appeal from the United
\*   States District Court
\*   for the District of
\*   of South Dakota.

_____

Submitted: May 11, 1998

Filed: December 1, 1998

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and FAGG, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Merlin J. Bruguier, Sr., was charged with aggravated sexual abuse, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(A). He was convicted by the jury and sentenced to 25 years and 10 months (262 months) in prison, to be followed by five years of supervised release. The defendant was also fined $4,500.00 and ordered to pay a special assessment of $100.00. This appeal followed. The defendant contends, among other things, that the District Court erred in allowing testimony about various

uncomplimentary aspects of his past life.  We affirm, finding no error sufficiently serious to justify reversal.  In some instances, the record is not properly preserved; in others, we agree with the District Court's rulings; and, in still others, we believe that the error, if any, was harmless.  Central to our conclusion is the fact that the defendant put his own character in issue.

## I.

We briefly state the background facts, reserving more detailed statements for the portions of this opinion in which we discuss the individual points of error argued by the defendant.  The case arises out of an incident in which M.M.B., Bruguier's 17-month old daughter, suffered injuries in August of 1996.  The baby's thigh bone and one leg were injured, and her perineum, the area between the vagina and the anus, was seriously torn.  The defendant contends that the injuries occurred when the family car accidentally rolled over M.M.B.  The case was hotly contested at trial and could have gone either way, but there was unquestionably evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt.  Among other things, defense witnesses had told conflicting stories about what happened, most of the medical testimony at trial was to the effect that it was extremely unlikely that all of the baby's injuries could have been caused by the car, and at least one sperm cell was found in material taken from M.M.B.'s person.  In addition, defendant made a statement during an interview with an FBI agent in which he admitted "inappropriate sexual contact" between himself and the child.

## II.

The issues we have found most difficult have to do with defendant's claim that the District Court allowed a number of irrelevant and prejudicial items of evidence to be introduced against him.  We address in turn the specific evidentiary points that seem to us substantial.

Bruguier's mother-in-law, Colette Iron Hawk, testified for the defense that Bruguier was a good father and that she had never known him to discipline the children physically or to abuse them sexually. On cross-examination the government asked about prior findings that the Bruguiers had neglected their children:

Q:       You say the defendant has been a good father?

A:       Yes, he has.

Q:       Can you explain why in January 1990 he and Rhene were found neglectful by the Department of Social Service?

A:       When is this?

Q:       Neglect of their children in 1990?

A:       I don't recall that.

Q:       You are not aware they were?

Defense:    Objection, Your Honor. I object to this. First of all, I have never been provided this information. Secondly, it's irrelevant unless we have some kind of identification other than his unsupported allegation.

The Court:    Are you in a position to establish what you're talking about?

Government:    Yes.

The Court:    Overruled. If she doesn't know anything about it, that ends it.

A:       I don't know.

> Government: Were you aware that they were -- for two years they were supervised by Child Protection Services?
>
> A: No, I was not aware.

Trial Transcript 529-30.

Violet Good Bear, a community health representative, also testified that Bruguier was a good father. She explained that she had observed Bruguier interacting well with his children hundreds of times during her home visits with the Bruguiers. On cross-examination, the government asked her: "In 1990 there was a finding of substantial neglect by the Bruguiers. Were you aware of that, by the tribal social services?" Ms. Good Bear responded that she was unaware of such a finding. The government continued, "Were you aware that for two years they were supervised by tribal social services?" Again, the witness responded "no." Trial Transcript 577.[1]

We hold that the District Court did not err in allowing this testimony. Under Rule 404(a)(1), evidence of a person's character or a trait of character is generally not admissible for the purpose of proving action in conformity therewith on a previous occasion. An accused, however, may offer evidence of a pertinent trait of character (here, that he was a good father), and, if he does, the prosecution may offer evidence in rebuttal. Further, under Rule 405(a), if evidence of character or a trait of character is admissible, "proof may be made by testimony as to reputation or by testimony in the form of an opinion." Here, Ms. Iron Hawk and Ms. Good Bear testified in the form of an opinion. They gave their opinion that the defendant was a good father. We think it was proper cross-examination for the government to explore the witnesses' basis for

---

[1]There was no objection to this line of questioning of Ms. Good Bear. (Counsel handling this case on appeal did not try the case.) Thus, our review of the issue, insofar as the cross-examination of Ms. Good Bear is concerned, is for plain error only.

holding such an opinion. If, for example, a finding of child neglect had been made with respect to Mr. Bruguier, and if the witnesses knew that, any grounds for their believing that Mr. Bruguier was a good father would be undermined. And if, on the other hand, the witnesses were not aware of such a finding, a jury might believe that their acquaintance with the defendant was not thorough enough to justify their opinion.

So we think the fact inquired about — whether the witnesses knew of a finding that the defendant and his wife had neglected their children — was relevant. The real difficulty with the government's conduct here is that it was allowed to state, in the presence of the jury, that such a finding had in fact been made, or, at least, that there was a reasonable basis for the government's belief that it had been made. This was not the procedure that should have been followed, and government counsel ought to have known it. When this sort of "did you know" question is asked, and the fact inquired about would be injurious to defendant's character and is not otherwise in evidence, preliminary proceedings outside the presence of the jury should be conducted first. At these proceedings, either in camera or at the bench, the government could privately state its evidence that a finding of neglect had been made, defense counsel could argue with the evidence or attempt to rebut it in some way, and the Court could satisfy itself that the government had a reasonable, good-faith basis for asking its question. That did not happen here. What we said in United States v. Krapp, 815 F.2d 1183 (8th Cir.), cert. denied, 484 U.S. 860 (1987), fits the present case.

> However, we admonish the Assistant United States Attorney for asking Krapp's character witness about the Krapps' tax returns in front of the jury without first raising the matter with the trial judge. Before an attempt at impeachment of a character witness with "did you know" type questions such as this, the trial judge should have the opportunity, out of the hearing of the jury, to rule on the propriety of the questions. By failing to raise the matter first with the trial judge, the

Assistant United States Attorney created the risk of mistrial after substantial time had been invested in the trial.

Id. at 1186 (citations omitted).  In Krapp, defense counsel, in addition to objecting to the question, made a motion for mistrial, which the trial court denied.  On appeal, we held that the question was improper, but that it was not an abuse of discretion to deny the mistrial.  We took the view that "the question did not have a substantial adverse impact on the verdict."  Ibid.

In the present case, defense counsel duly objected to the question when it was put to Ms. Iron Hawk.  He stated that the information about a finding of neglect would be "irrelevant unless we have some kind of identification other than his unsupported allegation."  Tr. 529.  Counsel was making the point that the government ought not to be allowed to ask such a question unless it had some support for the claim that defendant had been found to have neglected his children.  It was then that the Court asked whether the government was in a position to establish what it was talking about, to which question counsel for the government answered yes.  The Court then overruled the objection.  Defense counsel did not ask that the matter be taken up in chambers; he did not move for a mistrial; and he did not ask for an instruction that would tell the jury that government counsel's statement could not itself be regarded as evidence.  The Court could well have instructed counsel, on its own motion, to repair to chambers so the matter could be explored in the proper fashion, and indeed, we believe that it should have done so.  Absent a more specific objection from counsel, however, and in the particular circumstances of this case, we are not persuaded that the error worked any substantial prejudice.  If a chambers conference on the matter had been held, we have no reason to think that government counsel could not have backed up his assertion.  If he had done so, it would then have been proper for the proceedings to have returned to the presence of the jury, and for the witnesses to be allowed to answer the question.

Bruguier also cites United States v. Monteleone, 77 F.3d 1086 (8th Cir. 1996). There, Monteleone, a veteran of the Kansas City, Missouri, fire department, was convicted of disposing of a firearm to a convicted felon. At trial, Monteleone presented evidence of his reputation for truthfulness and lawfulness in the community. During cross-examination, over defense objections, the prosecutor asked a character witness whether he had heard that Monteleone had lied to a grand jury many years before. The defendant was convicted the same day. We reversed, holding that the manner in which the "specific act" cross-examination was conducted was prejudicial error.

There are important distinctions between Monteleone and the present case. In the first place, the character witness in Monteleone was a reputation witness. He testified about the defendant's reputation in the community for truthfulness and lawfulness. Here, the character witnesses were opinion witnesses. They gave their own opinion as to a specific trait of character, namely that Bruguier was a good father. One of the reasons for our reversing the conviction in Monteleone was that the government had no good-faith basis for "believing that Monteleone's conduct before a federal grand jury was likely to have been known in the relevant community." 77 F.3d at 1090. When the prosecution cross-examines a reputation character witness it "must do more than simply establish a 'good faith belief that the incidents to which the questions alluded actually occurred.' In addition, the prosecutor must possess a good faith belief that the described events are of a type 'likely to have become a matter of general knowledge, currency or reputation in the community.' " Id. at 1090 (citations omitted). Otherwise, the specific acts inquired about would have no relevance to a defendant's reputation, and, thus, no relevance to the witness's knowledge of that reputation. Where, as in the present trial, the witness gives her own opinion about a trait of character, as opposed to her opinion about general reputation in the community, the case is otherwise. A specific instance of misconduct, even if not of the kind generally known in the community, would be relevant to the witness's own opinion, for reasons we have explained. The reason for reversal in Monteleone was that "the Government did not demonstrate a good faith basis for believing that Monteleone's

alleged perjury was likely to have been a topic of discussion in the relevant community . . .." Id. at 1090. This rationale does not apply here. In addition, the fact inquired about in the present case — whether a public agency had made a specific finding — can easily be verified. The same is not true about the accusation that a certain person lied to a grand jury, where there has been no independent judicial inspection of whether a lie was told, and where the person accused of lying was never indicted for his allegedly perjurious conduct. Id. at 1090 n.2.

On the whole, we are convinced that what occurred here did not adversely affect Bruguier's substantial rights. The procedure that was followed left something to be desired, for reasons we have tried to explain, but we see no reversible error.

Defendant also objects to a question asked by the government about his record of arrests. Rhene Bruguier, the defendant's wife, testified for the defense that her husband was a good father. On cross-examination, the government asked, "do you think it is a good father to be arrested 36 times?" Tr. 495-96. The defense objected, the Court sustained the objection, and no further mention of the issue was made. We think the question was improper. We reject the government's contention that arrests prove anything. An arrest shows only that the arresting officer thought the person apprehended had committed a crime, assuming that the officer acted in good faith, which will usually but not always be the case. An arrest does not show that a crime in fact has been committed, or even that there is probable cause for believing that a crime has been committed. The question, accordingly, should not have been asked. However, the District Court immediately sustained the objection, and the question was never answered. Nor was any evidence of the "36 arrests" put before the jury.[2] We see

---

[2]According to the presentence report, which was not denied in this respect, the defendant had in fact been arrested on 89 previous occasions. PSR p. 6, at ¶ 31. The figure 36 appears to represent not arrests, but actual convictions of the defendant for minor offenses in a tribal court. Ibid. The District Court did not ask the government if it had a reasonable basis for believing that defendant had been arrested 36 times, but

-8-

no error here. Possibly the jury may have gotten the impression, from the government's question alone, that defendant had an extensive prior arrest record, but no motion was made for an instruction telling the jury to disregard the question, nor was a motion made for a mistrial. We repeat, as we have already said in the course of our discussion of the cross-examination with respect to a finding of child neglect, that this sort of question (even if it had been relevant) should not have been asked, in the first instance, in the presence of the jury. Here, however, as we have said, the District Court promptly branded the question as objectionable, and defense counsel asked for no further relief.

Bruguier also argues that he was unduly prejudiced when FBI Agent Pritchard testified about statements the defendant allegedly made in his interview with Pritchard. On direct examination, Pritchard testified, "I inquired about the nature of his relationship with his wife and his drinking habits." (Pritchard's theory, apparently, was that appellant was not satisfied with his sexual relationship with his wife, and that, when he was drinking, his frustrations would increase, and his inhibitions decrease, so as to make improper sexual contact with a child more probable.) When the government asked what Bruguier had told Pritchard, Pritchard responded, "that he used to drink; he smoked marijuana when it was available." An objection was then sustained. The government next asked "what else did [Bruguier] indicate in regard to his relationship with his wife?" Pritchard answered, "he described somewhat an abusive relationship, indicating he has beat or hit her in the past." Again, an objection was sustained. Tr. 208-09.

We think the evidence was relevant. Agent Pritchard's theory of a possible relationship between defendant's drinking and the likelihood of sexual abuse was a tenable one. The fact that defendant had, in the past, abused his wife was relevant to show that Mrs. Bruguier had reason to be afraid of her husband, and, therefore, reason

---

it seems pretty clear that it did.

to testify in his favor. At the same time, this evidence had a strong potential to be unfairly prejudicial. The issue in the case was what, if anything, Bruguier had done to M.M.B., and questions of his drinking or spousal abuse were not directly related to the main issue. This danger of unfair prejudice, we are sure, explains why the District Court sustained the defense objections. We think the Court did all it could to avoid the danger of unfair prejudice. The objections were not made until after the questions had already been answered, and the Court's action in sustaining them was prompt and unequivocal. Counsel asked for no further relief. We see no error here.

Next, Bruguier challenges the testimony of Paddy Aungie, a social worker with the Cheyenne River Sioux Tribe. Ms. Aungie had filed a petition for custody of M.M.B. while she was still in the hospital. Government counsel asked her, "was there a concern that the parents were going to take this child out of medical — providing medical care?" Over objection, Ms. Aungie was permitted to answer, "yes." Tr. 336-37. The witness was asked on voir dire whether, in answering this question, she was going to rely on what somebody else had told her. The witness answer, "yes, because it was from the Doctor." Defense counsel then objected on the basis of hearsay. The objection was overruled, and the witness was then permitted to answer that she had filed a petition with the tribe to get custody of the child because she was concerned that the child would not get any medical care if she remained in the custody of her parents. According to Ms. Iron Hawk, the defendant's mother-in-law, the defendant and his wife in fact were planning to take M.M.B. out of the hospital, but it was their intention to place the child at Indian Health Services. Tr. 532. So there was evidence properly before the jury, entirely apart from any hearsay, that M.M.B.'s parents wanted to take her out of the hospital. The only objection made to this line of questioning was a hearsay objection. It may have been unfairly prejudicial for the Court to admit evidence indicating that some official person believed that it would be dangerous to leave M.M.B. in her parents' custody, but this was not the basis of the objection made at trial, and, in any event, the entire matter was mentioned only briefly and only once. We do not think it could have had much influence on the jury's verdict.

-10-

Defendant argues that his conviction should be reversed for a number of other reasons. We shall address them in turn.

1.     It is said that defendant's admissions, summarized above during our statement of the case, should have been suppressed, because they were not preceded by <u>Miranda</u> warnings, and because they were not voluntary. As to <u>Miranda</u>, we are satisfied that warnings were not required, because defendant was not in custody at the time of the interview by Agent Pritchard. Defendant had not been arrested, and the interview took place in a room at St. Mary's Hospital. Mr. Bruguier was free to leave at any time, and after the interview was over, he was not arrested. The interview ended at once when defendant asked to speak with his attorney.

As to whether the statements were voluntary, we have no doubt that they were. Possibly, as defendant contends, he did not know English well enough to understand some of the words that were used, including "inappropriate." (Recall that defendant had answered "yes" when asked if he had had "inappropriate contact of a sexual nature" with M.M.B.) Defendant also nodded his head up and down, a motion normally taken to mean "yes," when asked a number of other incriminating questions. He now argues that he did not understand the questions, and that his nods meant only that he heard what the agent said, not that he understood it or agreed with it. We do not think that any of these questions go to voluntariness, as properly understood. Instead, they concern the meaning of defendant's statement, or the weight to be given various parts of it, and these were questions for the jury. There is no substantial evidence that Agent Pritchard coerced the defendant, or that his will was overborne. We therefore reject these arguments.

2.     Defendant claims that it was error to admit the testimony of Stacy Anderson, a technician with the South Dakota Crime Laboratory. Ms. Anderson

received fecal material taken from the person of M.M.B. and subjected it to various tests. She stated her opinion that she observed seven sperm heads on this material. We see no error in the District Court's decision to admit this evidence. Ms. Anderson had had substantial practical experience in the identification of sperm, and such experience is often worth as much as formal academic training. In addition, two other qualified serologists with undoubted credentials agreed with Ms. Anderson as to at least one sperm cell.

3.      Mr. Bruguier argues that the District Court should have instructed the jury on the issue of the voluntariness of defendant's admissions. No such instruction was requested, and we see no plain error. See United States v. Houle, 620 F.2d 164, 166 (8th Cir. 1980). Defense counsel argued vigorously to the jury that the admission should be discounted for all of the reasons we have described, and it was for the jury to make this decision.

4.      Defendant claims that the jury's verdict was coerced. After deliberating about four hours, the jury sent the judge a note indicating that they were deadlocked. After discussing the matter with counsel, the Court brought the jury into open court and inquired whether further deliberation would be fruitful. The jury foreperson said, "[w]e were in a position as we were called here in a new mode of negotiating so we might be able to do something within the next hour." Tr. 702. The Court told the jury that they could either stay and deliberate further, or come back tomorrow, if they needed more time to think the case over. The foreperson said that the jury would consider what to do. The jury then retired and, within about an hour, returned with a verdict of guilty. There is absolutely no evidence of coercion here. The trial court did not give the Allen or "dynamite" charge. It did not tell the jury that they would have to stay until a particular time that night. It did nothing whatever except to leave to the jury both whether to deliberate further, and on what day. This is the opposite of coercion.

IV.

Defendant presents two arguments with respect to the sentence that was imposed on him.

1.	The sentencing hearing was conducted, and sentence was imposed, by a judge other than the judge who presided over the trial. Rule 25(b) of the Federal Rules of Criminal Procedure provides, in pertinent part, as follow:

> If by reason of absence, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties . . ..

Defendant's brief asserts that the judge who tried the case was not absent, dead, sick, or disabled. Thus, he claims, there was no justification for another judge to impose sentence.

The difficulty with this argument is that no objection whatever was made in the Court below to the substitution of judges. For that reason, we do not know why the substitution was made, and cannot determine whether the reason for it complied with Rule 25(b). Certainly, such substitutions should not be made lightly, or for the mere convenience of one of the judges. We think it would be a good idea, when substitutions of this kind occur, for the sentencing judge to put on the record the reason for the procedure. But we are not willing to reverse this sentence in the absence of a properly made objection below. There is no showing of error at all, let alone plain error. The sentencing judge did indicate that he was at some disadvantage because of not having heard the evidence at trial, but he had read the transcript, and we have no reason to believe that he was unable to perform his duty at sentencing.

2.	Finally, defendant contests the findings made in connection with the determination of his sentence.  It is agreed that the base offense level for aggravated sexual abuse is 27.  See U.S.S.G. § 2A3.1.  To this base level 12 points were added for specific offense characteristics, as follows:  four points because force was used against the victim, see U.S.S.G. § 2A3.1(b)(1); four points because the victim had not attained the age of 12 years, see U.S.S.G. § 2A3.1(b)(2)(A); two points because the victim was in the custody and care of the defendant, see U.S.S.G. § 2A3.1(b)(3)(A); and two points because the victim sustained serious bodily injury, see U.S.S.G. § 2A3.1(b)(4)(B).  Defendant contests the two points added for the use of force and the two points for causing serious bodily injury.  At the sentencing hearing, defendant called an expert witness who had not testified at trial.  This expert gave what appears to us to be persuasive testimony indicating that the child's injuries, and the force exerted on her body, were likely caused by an automobile accident, as defendant had testified at trial.  The District Court, however, was not persuaded by this witness.  It found the trial testimony of three other experts more convincing.  This is the kind of decision that is properly left to the trier of fact.  The findings that the child suffered serious bodily injury at the hands of the defendant, and that the defendant used force against the child during the offense, are not clearly erroneous.

V.

We have read the entire transcript of the trial and of the sentencing hearing.  We have pondered the issues with some care.  As the case went to the jury, both sides had strong points.  The jury might have been left with a reasonable doubt, but it was not, and it is not our business to interfere with the verdict in such an instance.  Accordingly, the judgment of conviction and the sentence imposed on defendant are

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.