RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

*v.*

JONATHAN PATRICK ROSE,

　　　　　　　　*Defendant-Appellant.*

No. 06-1642

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 04-20038—David M. Lawson, District Judge.

Argued: January 31, 2008

Decided and Filed: March 26, 2008[*]

Before: MOORE, CLAY, and ROGERS, Circuit Judges.

---

## COUNSEL

---

**ARGUED:** David A. Koelzer, FEDERAL DEFENDER'S OFFICE, Flint, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** David A. Koelzer, FEDERAL DEFENDER'S OFFICE, Flint, Michigan, for Appellant. Michael Hluchaniuk, ASSISTANT UNITED STATES ATTORNEY, Bay City, Michigan, for Appellee.

---

## OPINION

---

　　　　CLAY, Circuit Judge. Defendant Jonathan Patrick Rose appeals his conviction in the United States District Court for the Eastern District of Michigan for selling a firearm to a known felon in violation of 18 U.S.C. §§ 922(d)(1) and 924(a)(2), and possessing an unregistered silencer in violation of 28 U.S.C. § 5861(d). For the reasons stated below, we **AFFIRM** Rose's conviction.

---

[*]This decision was originally issued as an "unpublished decision" filed on March 26, 2008. On April 8, 2008, the court designated the opinion as one recommended for full-text publication.

# BACKGROUND

## A.     Substantive Facts

In the fall of 2003, David McWhorter agreed to become an informant for federal authorities in order to receive leniency on a pending firearms charge.  McWhorter had met Jonathan Rose in a Michigan state prison prior to becoming an informant.  In early 2004, Rose asked McWhorter and a mutual associate, Donald York, to procure a silenced nine millimeter gun for him.  York later contacted McWhorter when he located such a gun along with a silencer, ammunition and a bullet-proof vest.  McWhorter was present when Rose paid for the gun and other items.

Later in 2004, the FBI agent to whom McWhorter reported asked McWhorter to try to buy back the gun to get it off the street.  On April 2, 2004, McWhorter had a tape-recorded conversation with Rose in which he negotiated the purchase of the gun.  The following day McWhorter had a tape-recorded conversation with Rose regarding McWhorter and Rose meeting that day for Rose to purchase the gun.  At the meeting, which was also tape recorded, Rose purchased the gun along with a silencer and a magazine of ammunition.

## B.     Procedural Facts

On December 8, 2004, Jonathan Patrick Rose was indicted with three co-defendants in the United States District Court for the Eastern District of Michigan.  The First Superseding Indictment charged Rose with a number of crimes involving firearms: being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), possessing a firearm from which the serial number had been removed in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B), and selling a firearm to a known felon in violation of 18 U.S.C. §§ 922(d)(1) and 924(a)(2).  On August 25, 2005, the government filed a notice of its intent to seek an Armed Career Criminal sentencing enhancement as a result of Rose's multiple prior convictions for breaking and entering and home invasions.  Rose subsequently filed a motion for severance which the district court granted.  On December 14, 2005, Rose was charged in a Fifth Superseding Indictment with the same charges contained in the First Superseding Indictment with the addition of a charge of possessing an unregistered silencer in violation of 28 U.S.C. § 5861(d).

On January 10, 2006, the district court granted the government's motion to dismiss two counts of the indictment against Rose, the charges for being a felon in possession of a firearm and possessing a firearm from which the serial number had been removed.  In making its motion, the government represented that it did not believe it could sustain its burden of proof on these counts.  The district court conducted a three-day jury trial that concluded on January 12, 2006, and the jury returned a guilty verdict on both remaining counts of the indictment.

On January 19, 2006, counsel for Rose renewed a motion made at trial to dismiss count 20 of the Fifth Superseding Indictment that charged Rose with selling firearms to a known felon.  The basis for Rose's motion was the lack of a federal nexus between the intrastate sale of firearms and the federal statute prohibiting such sales.  After hearing oral argument on this motion, the district court denied the motion to dismiss.  Following a sentencing hearing on April 20, 2006, the district court sentenced Rose to 120 months of imprisonment to begin on the earlier of December 1, 2009 or the date of Rose's release from a previous undischarged sentence that Rose was serving with the Michigan Department of Corrections.  Judgment was entered on April 28, 2006, and Rose filed a timely notice of appeal on May 1, 2006.

## DISCUSSION

### I. JURY REVIEW OF CD RECORDINGS

#### A. Standard of Review

Rose claims that the district court erred in allowing the jury to review during deliberations compact disc ("CD") versions of recordings entered into evidence. When a defendant contemporaneously objects to the submission of evidence to the jury, we review the district court's decision under an abuse of discretion standard. *United States v. Smith*, 419 F.3d 521, 527 (6th Cir. 2005). However, Rose failed to make a contemporaneous objection regarding the jury's review of the CDs during deliberations. As a result, we review this issue under a plain error standard. Fed. R. Crim. P. 52(b). *United States v. Segines*, 17 F.3d 847, 851 (6th Cir. 1994). When reviewing a district court's decision under this standard, we may only engage in error correction when (1) an error has been made, (2) the error is plain, and (3) the error affects the defendant's substantial rights. *United States v. Seymour*, 468 F.3d 378, 384 (6th Cir. 2006) (quoting *United States v. Thomas*, 11 F.3d 620, 630 (6th Cir.1993)). If these three conditions are met, we must decide whether to exercise our discretion to correct the error. *Id.* The exercise of discretion is warranted "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 736 (1993) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

#### B. Analysis

Rose contends that the district court erred in allowing the jury to take into the jury room CD versions of recordings that had been admitted into evidence. At trial three recordings of McWhorter's conversations with Rose were entered into evidence. These recordings were stored in audio files on a laptop computer and played for the jury during McWhorter's testimony. During jury deliberations, the jury asked to listen to one of the recordings, and the district court allowed them to listen to the recording in the courtroom due to the location of the recordings on the laptop and the court's concerns about the jury members' ability to operate the laptop themselves. Later in the jury deliberations, the jury asked that the recordings be brought into the jury room. At this time the Assistant United States Attorney ("AUSA") consulted with technical staff who were able to transfer the recordings from the laptop to CDs. To do so, they transferred the audio files from a format that could only be played on laptops to a file format that could be played on CDs. The CDs containing the recordings were then sent into the jury room to be played on a stereo.

Rose claims that the district court erred in allowing the CDs, which had not been admitted into evidence, into the jury room and cites *United States v. Segines*, 17 F.3d 847 (6th Cir. 1994), and *United States v. Scaife*, 749 F.2d 338 (6th Cir. 1984), in support of his argument. Both cases are inapposite. In *United States v. Segines*, the district court admitted a composite tape of recordings of the defendants' interactions with informants. *Segines*, 17 F.3d at 853. Although the full recordings were never admitted into evidence, the district court allowed the jury to take the full recordings into the jury room during the jury's deliberations. *Id.* at 855. We held that the district court erred, and for this reason, among others, we remanded the case for a new trial. *Id.*

In *United States v. Scaife*, we examined the district court's decision to allow the jury to take into the jury room a tape that had been used for rebuttal but had not previously been admitted into evidence. *Scaife*, 749 F.2d at 346-47. During deliberations the jury requested to hear the tape again, and although the exhibit had not previously been admitted into evidence, the district court admitted the tape into evidence and allowed the jury to take the tape into the jury room. *Id.* at 347. We held that the district court's belated admission of the tape into evidence was erroneous. *Id.* Despite this determination, the error was found to be harmless because "[a] proper foundation had been laid for the tape and the defendants did not question the tape's authenticity or accuracy." *Id.*

*Segines* and *Scaife* are easily distinguishable from the instant case. Unlike the recordings in *Segines* and *Scaife* that were determined to have been taken into the jury room erroneously, the recordings at issue in Rose's case were admitted into evidence. In this case, the only difference between the recordings when they were taken into the jury room and when they were admitted into evidence was the medium on which they were stored. Because the recordings had been entered into evidence, it was not error for the district court to allow them into the jury room. *Scaife*, 419 F.2d at 347 ("A district court has broad discretion to permit a jury to take to the jury room any tape recordings that have been admitted as exhibits during trial."). The use of CDs was simply a practical solution to the technical challenge of enabling the jury to play the digital recordings. As we have said in response to objections to the presence of tape players in the jury room,"[a]n audio exhibit should not be relegated to muteness because it can be perused only through the use of a tape player." *United States v. Smith*, 861 F.2d 722, 1988 WL 114817, at *1 (6th Cir. 1988) (unpublished table decision) (quoting *United States v. Bizanowicz*, 745 F.2d 120, 123 (1st Cir.1984)). The same principle holds true for digitally recorded audio exhibits.

Even if Rose's arguments that the CDs were not admitted into evidence were well taken, any error caused by sending the CDs into the jury room would be harmless. The recordings sent into the jury room may be understood to constitute "original" recordings within the meaning of Rule1001(3) of the Federal Rules of Evidence or "duplicate" recordings within the meaning of Rule 1001(4) of the Federal Rules of Evidence. Under Rule 1003, a duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original or in the circumstances it would be unfair to admit the duplicate in lieu of the original. No questions were raised regarding the authenticity of the recordings, and Rose has not shown the CDs to have been prejudicial. In fact, when this issue was raised at sentencing, defense counsel agreed that before sending the CDs into the jury room, the government had played the CDs in the presence of defense counsel to ensure they were exact copies of the recordings stored on the laptop. *United States v. Angelilli*, 660 F.2d 23 (2d Cir. 1981) (holding that any error in playing for the jury during deliberations a cassette that had not been admitted into evidence which was a duplicate of a cassette that had been admitted into evidence was harmless where the defendant gave no evidence of differences between the tapes). There was no violation of Defendant's rights in the instant case regardless of whether the recordings in question are deemed to be originals or duplicates which were erroneously but harmlessly provided to the jury.

## II.    PROSECUTORIAL MISCONDUCT

### A.    Standard of Review

Rose claims that the AUSA's reference in his opening statement to the fact that Rose had been in prison deprived him of a fair trial. Generally, "[a]ppellate courts review a district judge's conduct of a trial, including the conduct of opening statement, for abuse of discretion." *United States v. Burns*, 298 F.3d 523, 543 (6th Cir. 2002) (quoting *Cox v. Treadway*, 75 F.3d 230, 237 (6th Cir.1996)). In the prosecutorial misconduct context, we must first determine whether the remarks made by the prosecutor were improper. *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003). If they were, we must determine "if the remarks were flagrant and warrant reversal." *Id.* To determine whether the remarks were flagrant we must analyze "1) whether the statements tended to mislead the jury and prejudice the defendant; 2) whether the statements were isolated or pervasive; 3) whether the statements were deliberately placed before the jury; and 4) whether the evidence against the accused is otherwise strong." *Id.*

Since Rose failed to make a contemporaneous objection to the AUSA's statements during opening argument, we review for plain error. *Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007). Under the plain error standard, we may only engage in error correction when (1) an error has been made, (2) the error is plain, and (3) the error affects the defendant's substantial rights. *United States*

*v. Seymour*, 468 F.3d 378, 384 (6th Cir. 2006) (quoting *United States v. Thomas*, 11 F.3d 620, 630 (6th Cir.1993)).  If these three conditions are met, we must decide whether to exercise our discretion to correct the error.  *Id.*  The exercise of discretion is warranted "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *United States v. Olano*, 507 U.S. 725, 736 (1993) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

**B.      Analysis**

During the government's opening statement, the AUSA referred to the fact that McWhorter had been in prison with Rose.  Rose claims that this reference was unnecessary and prejudicial because the fact that Rose had been convicted of a felony was not at issue in his trial.  Rose was charged with selling a gun to a known felon, a crime which depended on McWhorter's criminal history, and not Rose's.

On appeal, the government contends that the fact that Rose was in prison with McWhorter was relevant to the element of § 922(d)(1) that requires the person who disposed of a firearm to know that the person receiving the firearm is a felon.  According to the government, the jury could infer that Rose knew McWhorter was a felon based upon the fact that Rose and McWhorter were in prison together.  We agree that the probative value of the information regarding Rose's association with McWhorter in a situation from which Rose could easily gather that McWhorter was a felon significantly outweighs any unfair prejudice that would arise from the jury's knowledge that Rose had been imprisoned.  *See* Fed. R. Evid. 403.  Since the AUSA's remarks were relevant and highly probative in relation to the charge of disposing of firearms to a known felon, the remarks were not improper.

**III.     COMMERCE CLAUSE**

**A.      Standard of Review**

We review a district court's decision regarding the constitutionality of a statute *de novo*. *United States v. Napier*, 233 F.3d 394, 397 (6th Cir. 2000).

**B.      Analysis**

Rose was convicted under 18 U.S.C. § 922(d)(1), a federal statute that makes it "unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."   18 U.S.C. § 922(d)(1) (2000).  Rose claims that his conviction was unconstitutional because Congress exceeded its Commerce Clause power by enacting § 922(d)(1).  Rose's contention lacks merit inasmuch as applicable Supreme Court precedent leaves no doubt regarding the constitutionality of § 922(d)(1).

The Constitution gives Congress the power to regulate interstate commerce.  U.S. Const. art. I, § 8, cl. 3.  Congress has utilized this power to promote a variety of ends including the protection of workers, the elimination of discrimination, and the control of the use of illicit drugs.  *Gonzales v. Raich*, 545 U.S. 1 (2005) (regulating the use of marijuana); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) (forbidding discrimination in public accommodations); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) (forbidding unfair labor practices).  However, the power of Congress to regulate pursuant to the Commerce Clause has its limits.  The Supreme Court has held that Congress's power under the Commerce Clause only extends to the regulation of "the use of the channels of interstate commerce," *United States v. Lopez*, 514 U.S. 549, 558 (1995), "instrumentalities of interstate commerce, or persons or things in interstate commerce," *id.*, and "activities having a substantial relation to interstate commerce," *id.* at 558-59.  Rose contends, and

we agree, that 18 U.S.C. § 922(d)(1) should be analyzed as a purported regulation of "activities having a substantial relation to interstate commerce."

The Supreme Court analyzed whether a statute regulating intrastate economic activity was substantially related to interstate commerce in *Gonzales v. Raich*, 545 U.S. 1 (2005). In *Raich* the Court held that the application of the Controlled Substances Act ("CSA"), which prohibited the possession of marijuana, to California users of homegrown marijuana for medical purposes was a proper use of Congress' Commerce Clause powers. In making this determination, the Court held that an activity involving a commodity for which there is an interstate market has a substantial relation to interstate commerce if Congress had a rational basis to conclude that "failure to regulate that class of activity would undercut the regulation of the interstate market in the commodity." *Raich*, 545 U.S. at 18. In its determination that the failure to regulate homegrown marijuana would undercut a larger regulatory scheme, the Court noted that the cultivation of marijuana involved a fungible commodity for which there existed an interstate market. *Id.* The Court also examined the purposes of the CSA and found that a primary purpose of the Act was to control the market for legal and illegal drugs. *Id.* at 19. From this analysis, the Court concluded that Congress had a rational basis to conclude that failing to regulate the intrastate activity in question would undermine its attempts to regulate the interstate market. *Id.* The Court did not require any factual findings from Congress specifically regarding the effects of the cultivation or possession of marijuana for intrastate use. *Id*. at 21. The Court relied instead upon the logical connections between the cultivation of marijuana for personal use and the interstate market in marijuana such as the possibility that marijuana cultivated for intrastate personal use could become a part of the interstate market. *Id.* at 19.

Applying the *Raich* analysis in the instant case leads to the conclusion that § 922(d)(1) is a proper use of Congress' Commerce Clause power. Guns are a fungible commodity for which there is an established interstate market. Section 922(d)(1) is also part of a larger regulatory framework. The legislative history of this framework is set forth succinctly in an Eleventh Circuit opinion upholding the constitutionality of § 922(d):

> Section 922(d) has its origins in Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 225. Title IV established federal licensing requirements and other regulations on the nationwide traffic in firearms. Among these provisions was the predecessor to the current § 922(d), then codified as § 922(c), which stated, in pertinent part:

> It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person, knowing or having reasonable cause to believe that such person is a fugitive from justice or is under indictment or has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year.

> Congress made a number of specific findings explaining the need for the legislation. Section 901(a) declared "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." § 901(a)(1). Congress further found "that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles . . . , narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States." § 901(a)(2). Moreover, Congress

determined "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all *persons engaging in the business of importing, manufacturing, or dealing in them*, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." § 901(a)(3) (emphasis added).

Several months after Title IV of the Omnibus Crime Control and Safe Streets Act of 1968 was enacted, it was superseded by the Gun Control Act of 1968, Pub.L. No. 90-618, 82 Stat. 1213, which "was designed to strengthen the firearms provisions which had been enacted as part of the omnibus crime bill." H.R.Rep. No. 90-1577, *reprinted in* 1968 U.S.C.C.A.N. 4410, 4412; *see also id.* at 4413. The Gun Control Act left the Omnibus Act largely intact, with two significant changes: it imposed restrictions on rifles and shotguns generally parallel to those that the Omnibus Act applied to handguns only; and it added provisions controlling interstate shipment of ammunition and sale of ammunition to juveniles. *See id.* The ban on firearm sales to felons was recodified in nearly identical language, again as § 922(c).

Although Congress deemed it "unnecessary" to include the Omnibus Act's specific findings in the Gun Control Act, the legislative history to the Gun Control Act makes clear that the rationale remained precisely the same. The expanded statute's purpose was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." *Id.* at 4411.

The ban on firearm sales to felons was finally enacted in its current form as part of the Firearms Owners' Protection Act of 1986, Pub.L. No. 99-308, 100 Stat. 449. The purpose of the amendment was to "close an existing loophole" by extending the ban, which previously applied only to federally licensed firearms dealers, to "all persons who transfer a firearm." H.R.Rep. No. 99-495, *reprinted in* 1986 U.S.C.C.A.N. 1327, 1343, 1348. Accordingly, § 922(d) was enacted in its current form, which prohibits "any person" from knowingly selling a firearm to a felon.

*United States v. Peters*, 403 F.3d 1263, 1274-75 (11th Cir. 2005). This legislative history supports the logical connection between the intrastate sale and disposition of firearms and the interstate market in firearms. Because Congress had a rational basis for concluding that the intrastate transfer of firearms would undercut its regulation of the interstate firearms market, § 922(d)(1) is a proper exercise of Congress's Commerce Clause power.[1]

## IV.    JURY INSTRUCTIONS REGARDING 26 U.S.C. § 5861(d)

## A.    Standard of Review

Rose promptly objected to the jury instructions regarding his possession of an unregistered silencer in violation of 26 U.S.C. § 5861(d). As a result, he has preserved this issue for review. This Court reviews "jury instructions as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a sound basis in law to aid the jury in reaching its decision." *United States v. Clark*, 988 F.2d 1459, 1468 (6th Cir. 1993). A judgment may be

---

[1]Only two federal appeals courts have analyzed this issue pursuant to modern Commerce Clause jurisprudence, and both have found § 922(d) to be a valid exercise of Congress's Commerce Clause authority. *Peters*, 403 F.3d 1263; *United States v. Montelone*, 77 F.3d 1086, 1091-92 (8th Cir. 1996). *See also United States v. Haskins*, 511 F.3d 688, 695 (7th Cir. 2007) (declining to directly address the Commerce Clause issue but citing *Peters* and *Montelone* with approval).

reversed if the jury instruction "fails accurately to reflect the law." *United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006) (quoting *United States v. Pensyl*, 387 F.3d 456, 458 (6th Cir. 2004)). However, this Court may not reverse unless "the instructions, viewed as a whole, were confusing, misleading or prejudicial." *Id.* (quoting *Pensyl*, 387 F.3d at 458).

**B.     Analysis**

Rose claims that the district court misled the jury with its instructions regarding the charge that Rose violated 26 U.S.C. § 5861(d) by possessing an unregistered silencer. Rose argues that the instructions gave the impression that the jury could convict even if Rose did not possess a silencer or an object intended to be a silencer. Rose was convicted of violating 26 U.S.C. § 5861(d), which makes it "unlawful for any person . . . to receive or possess any firearm which is not registered to him in the National Firearms Registration and Transfer Record." A silencer is a type of firearm, 26 U.S.C. § 5845(a)(7), and is defined by 18 U.S.C. § 921(a)(24) as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." The district court instructed the jury that in order to find Rose guilty the jury must find the following elements:

> First, that the defendant knowingly possessed the device described in the indictment.
>
> Second, the device was a firearm silencer, that is, it was a device for silencing, muffling or diminishing the report of a portable firearm, including any combination of parts designed or redesigned which the defendant intended for use in assembling or fabricating a firearm silencer, or firearm muffler, and any part intended only for use in such assembly or fabrication.
>
> Third, the defendant knew of the characteristics of the device that would make it function as a firearm silencer and he intended it to function as a firearm silencer and he intended it to function as such even if it did not actually work to silence a firearm.
>
> And, fourth, the firearm silencer was not registered to the defendant in the National Firearms Registration and Transfer Record.

(J.A. 263-64.)

Rose takes issue with the portion of the district court's third instruction that allows for conviction even if the silencer possessed was not functional. Rose claims that the object he was convicted of possessing could have been a "dummy silencer," an object that appears to be a silencer but that is not intended to function as a silencer. (Def. Br. 28.) The jury instructions clearly do not allow for conviction based on the possession of a dummy silencer that is not intended to become a silencer. The statutory definition itself encompasses parts intended for use in fabricating silencers, so if Rose bought a dummy silencer which he planned to convert into a silencer, he would be liable under § 5861(d). The district court's addition of language regarding whether the silencer actually functioned does not detract from its second instruction that specifically tracks the statutory definition of a silencer.[2]

---

[2] The district court's instructions were also in accordance with *Staples v. United States*, 511 U.S. 600 (1994), in which the Supreme Court held that § 5861(d) does not impose strict liability for the possession of unregistered firearms. In *Staples*, the Court interpreted this statutory provision as requiring proof "beyond a reasonable doubt that [the defendant] knew the weapon he possessed had the characteristics that brought it within the statutory definition." *Staples*, 511 U.S. at 602. Thus, the district court's third instruction followed controlling precedent on this point.

We have also specifically held that a defendant may be found guilty of violating 26 U.S.C. § 5861(d) for the possession of a non-functioning silencer. In *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006), the defendant argued that the evidence presented at trial was insufficient to support his conviction due to the government's failure to prove that the silencer he possessed was operable. *Carter*, 465 F.3d at 666. He also contended that the district court erred in failing to instruct the jury that the government must prove that the silencer was operable. *Id.* at 667. We rejected the defendant's arguments, based upon the plain statutory definition of a silencer contained in 18 U.S.C. § 921(a)(24) and the reasoning of two Seventh Circuit cases that came to the same conclusion. *Carter*, 465 F.3d at 666-67 (citing *United States v. Rogers*, 270 F.3d 1076, 1081 (7th Cir.2001), and *United States v. Syverson*, 90 F.3d 227, 232 (7th Cir.1996)). Rose attempts to distinguish his case from *Carter* by stating that pursuant to the jury instructions in his case the jury could have convicted him not only for possessing an inoperable silencer but also for possessing a "dummy silencer" which was not a silencer at all. As stated above, the jury instructions clearly contradict Rose's argument, and Rose's fourth assignment of error must fail.

## CONCLUSION

For the reasons stated above, we **AFFIRM** Rose's conviction.