# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 03-2871

—————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Louis F. Pirani, | * | |
| | * | |
| Defendant/Appellant. | * | |

—————

Submitted: January 15, 2004
Filed: August 5, 2004 (Corrected: 08/11/04)

—————

Before BYE, HEANEY, and SMITH, Circuit Judges.

—————

BYE, Circuit Judge.

Louis F. Pirani, a former deputy in the Crittenden County (Arkansas) Sheriff's Department, was convicted of violating 18 U.S.C. § 1001 by making false statements to federal investigators during their inquiry into allegations Crittenden deputies were taking money seized at drug interdiction points. Mr. Pirani appealed the judgement of conviction on the grounds the district court (1) committed reversible plain error when it allowed the prosecution to cross examine his character witness with a guilt-assuming hypothetical question and questions regarding specific acts of misconduct on his part, and (2) erred in admitting into evidence a recorded conversation in which he is heard using foul language while discussing the government's investigation. He

also appealed his sentence, contending the district court misapplied a cross reference in § 2F1.1 of the United States Sentencing Guidelines (U.S.S.G.), by sentencing him for obstruction of justice rather than the making of false statements. We affirm the conviction but reverse the sentence and remand for re-sentencing in light of <u>Blakely v. Washington</u>, 124 S.Ct. 2531 (2004).

I

A. The Investigation

In 2001, Mr. Pirani was a deputy for the Crittenden County, Arkansas, Sheriff's Department. That year, the Federal Bureau of Investigation (FBI) and Internal Revenue Service (IRS) launched an investigation to determine whether deputies were keeping money they recovered at drug interdiction points instead of submitting it for forfeiture.

As part of the investigation, Aundre Mack, a cooperating officer, videotaped a group conversation during which Mr. Pirani stated he had read about the investigation in the newspaper, knew officers who had been questioned and searched, and had no reason to be concerned about the investigation.

Soon thereafter, FBI and IRS agents indeed interviewed Mr. Pirani, seeking to ascertain whether or not he owned items they believed he could not have afforded on his legitimate income, particularly a Master Craft ski boat and 1980 Cessna airplane suspected to be his property. According to the agents who interviewed him, Mr. Pirani denied having an ownership interest in the ski boat and stated his brother, Stephen A. Pirani, owned the airplane.

After the investigators discovered extensive documentary evidence showing Mr. Pirani did have an interest in the crafts, they charged him with making false

statements, money laundering, and mail fraud. The district court dismissed the laundering and fraud charges, but Mr. Pirani was tried and convicted of two counts of making false statements in violation of 18 U.S.C. § 1001.

B. Trial Evidence

At trial, the government introduced records showing Mr. Pirani owned the Cessna airplane. The records included Federal Aviation Administration documents showing the applicant for the plane was "S&L Aircraft Sales and Rental, Steve Pirani and Louis Pirani," with the company's address and telephone number belonging to Mr. Pirani; S&L's articles of incorporation showing Mr. Pirani was the company's registered agent; Fidelity National Bank records showing the down-payment for the airplane was made with a check drawn on the account of Mr. Pirani and his wife Angela; other Fidelity records revealing Mr. Pirani signed all but one check drawn on the S&L account; a log marked "Louis amount" seized at Mr. Pirani's home, listing monetary amounts that matched currency deposits made into the S&L bank account; insurance-company documents indicating the airplane was insured in Mr. Pirani's name and address; and West Memphis Airport records listing Louis and Steve Pirani as owners of the Cessna under Mr. Pirani's personal address.

The government also introduced evidence showing Mr. Pirani owned the ski boat. These records included an Arkansas Department of Finance and Administration registration showing a 1997 Master Craft ski boat was registered to Louis Pirani; a 1999 personal property assessment for Louis and Angela Pirani revealing the couple assessed a 1997 Master Craft ski boat; and Fidelity records showing the check used to purchase the boat from Mr. Pirani was deposited in his savings account, which was closed six days after the federal agents interviewed him. Finally, Richard Bean testified he met Mr. Pirani on Greers Ferry Lake in 1997, and Mr. Pirani later traveled to Sherwood, Arkansas, to purchase from Mr. Bean a 1997 Master Craft ski boat, paying $26,500 in cash.

Finally, without a defense objection, the government introduced the videotape of the conversation recorded by Officer Mack as cooperating officer.

The defense called Linda Graham to testify as a character witness. On cross-examination of Ms. Graham, the prosecution asked her a series of nine questions designed to test the credibility of her opinion of Mr. Pirani's reputation for truthfulness. Imbedded in the last of these questions was the hypothetical assumption Mr. Pirani had denied his ownership interest in an airplane:

> Would your opinion of Louis Pirani's reputation for truthfulness change if you knew that Louis Pirani has said that his brother, not he, was the sole owner of an airplane; that Louis Pirani's own records show that he paid $9,300 in cash on the plane, not counting his half of the down payment?

The other questions in the series were syntactically parallel, starting with the same interrogative independent clause probing the firmness of Ms. Graham's opinion, and ending with a reference to a different hypothetical act of dishonesty by Mr. Pirani. For example, the prosecutor asked:

> Would your opinion of Louis Pirani's reputation for truthfulness change if you knew that on July 12, 1999, when Steven Bailey was stopped with $56,400 in currency, Louis Pirani told Deputy Joey Applegate that he stopped counting at $30,000, and only $30,240 in currency was turned in for forfeiture?

Defense counsel did not object to the guilt-assuming question or the questions regarding specific instances of Mr. Pirani's conduct.

C. Sentencing

At sentencing, to avoid problems with the Ex Post Facto Clause, the district court properly elected to apply the 2000 Guidelines Manual, that which was in effect at the time of Mr. Pirani's offense of conviction. In the 2000 Manual, U.S.S.G. § 2F1.1, which has a base offense level of 6, covers the offense of making false statements in violation of 18 U.S.C. § 1001. Application Note 14, however, directs the sentencing court to apply another guideline if it more specifically covers the offense set forth in the indictment:

> Sometimes, offenses involving fraudulent statements are prosecuted under 18 U.S.C. § 1001, or a similarly general statute, although the offense is also covered by a more specific statute . . . . Where the indictment or information setting forth the count of conviction . . . establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1.

The government argued the court should use the Note-14 cross reference and apply U.S.S.G. § 2J1.2, the guideline for obstruction of justice, instead of § 2F1.1. The district court agreed, concluding § 2J1.2 more aptly covered the offense alleged in the indictment and finding the facts proved at trial met the elements of obstruction of justice. Sentencing Mr. Pirani under § 2J1.2, which has a base offense level of 12, the district court ordered him to serve five months of incarceration, five months of home detention, and three years of supervised release. The court did not assess any enhancements.

Discussing the alternative, the district pointed out Mr. Pirani would receive a longer prison sentence under § 2F1.1. Although § 2F1.1 provides for a base offense level of only 6, the court reasoned, three enhancements would apply and raise the level to 16.

Subsequent to oral argument, the United States Supreme Court issued its decision in the landmark case of Blakely v. Washington, 124 S. Ct. 2531 (2004). Mr. Pirani then moved to remand the case for re-sentencing or, in the alternative, to supplement the briefs. He argues the cross reference violates his constitutional rights under Blakely by requiring the district court to make the factual finding his conduct satisfies the elements of obstruction of justice.

II

We review issues not raised in the lower court for plain error. United States v. Grady, 665 F.2d 831, 834 (8th Cir. 1981). The defendant must show the error was clear, obvious, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of the judicial proceeding. See United States v. Olano, 507 U.S. 725, 731-37 (1993). To show an error affected his substantial rights, the defendant must show the error was prejudicial and affected the outcome. United States v. Johnson, 12 F.3d 827, 835 (8th Cir. 1994).

Mr. Pirani challenges the government's cross examination of Ms. Graham on several fronts. First, he argues the district court committed plain error in allowing the prosecutor to question Ms. Graham, a reputation witness, about her opinion of Mr. Pirani's character. True, a witness who testifies regarding the defendant's reputation cannot be cross-examined about her personal opinion of the defendant. United States v. Curtis, 644 F.2d 263, 269 (3d Cir. 1981). Here, the prosecutor used phrasing that conflated opinion and reputation; he asked Ms. Graham if her *opinion* of Mr. Pirani's *reputation* would change if she knew he had committed the bad acts. We believe the questions had the net effect and intent of testing Ms. Graham's opinion regarding Mr. Pirani himself and not his reputation in the community. At least, Ms. Graham seems to have thus understood the questions, for she deflected them by suggesting she would need to have absolute proof of the hypothetical acts before she could change her mind about Mr. Pirani *himself*, not what others thought of him.

-6-

The district court, however, did not err in permitting the prosecution to thus proceed with the cross examination. Mr. Pirani's argument is based on a false premise. While defense counsel may have called Ms. Graham as a reputation witness and limited direct examination to Mr. Pirani's reputation, Ms. Graham in fact offered her own opinion of Mr. Pirani's character, at least at one interval in her direct examination:

> Defense Counsel: And what is his reputation for truthfulness in his community?
>
> Ms. Graham: Well, I think I could best explain it to you if I told you a little about my son. I'm the mother of an only child, the center of my life. And when Trent was with Louis, since Trent was a teenager, if he was with Louis, *I knew he was going to be okay. I didn't have to worry about anything. He was in good hands.*

(emphasis added). Implicit in the italicized statements was Ms. Graham's own opinion of Mr. Pirani's character as a person whom she could trust unconditionally to befriend her son. Thus, it was she who turned reputation into opinion testimony, opening the proverbial door for the prosecution to test the latter. When a witness testifies in the form of an opinion, it is proper cross examination for the government to explore the witness's basis for holding such an opinion. United States v. Bruguier, 161 F.3d 1145, 1150 (8th Cir. 1998). Thus, the district court did not err when it allowed the prosecutor to test the credibility of Ms. Graham's opinion of the defendant's character.

Mr. Pirani next argues the court committed a reversible error by permitting the government to ask a guilt-assuming question. As quoted above, the prosecution asked Ms. Graham whether her opinion would change if she knew Mr. Pirani denied owning an airplane and yet his own records showed he had paid for a plane. Because

he was at that moment on trial for lying to authorities about owning the airplane and ski boat, he argues the question assumed he was guilty of the offense for which he was on trial.

The federal courts have widely condemned guilt-assuming questions, and for obvious reasons. Such questions strike at the presumption of innocense by allowing the prosecution to foist its theory of guilt on the jury and by implying to the jury the prosecution has evidence of guilt beyond the evidence in the record. See, e.g., United States v. Guzman, 167 F.3d 1350, 1352 (11th Cir. 1999); United States v. Oshatz, 912 F.2d 534, 539 (2d Cir. 1990).

We do not believe the question at issue here amounted to plain error requiring reversal in this case. To obtain a conviction, the government sought to prove two general facts, first that Mr. Pirani owned the crafts and second that he knowingly lied about his ownership to federal authorities during an official investigation. Accordingly, the defective question asked Ms. Graham if her opinion would change if she knew each of these two facts to be true. Because it is, of course, not illegal to own an airplane, the part of the question hypothesizing about the second fact, that he lied to authorities, had the greater potential to inflict undue prejudice.

The question, however, only obliquely suggested Mr. Pirani had lied to investigators. "Would your opinion of Louis Pirani's reputation for truthfulness change," asked the question, "if you knew that Louis Pirani has said that his brother, not he, was the sole owner of an airplane. . . ?" The question is phrased in the abstract, referring to words Mr. Pirani "has said," without mention of an audience, a time, or a place for their saying. It would have been another thing entirely if the prosecutor had asked Ms. Graham whether her opinion would change if she knew Mr. Pirani lied to the authorities about owning the plane during an official investigation. Instead, as phrased, the question had the form and quality of a hypothetical, not of a fact known to the prosecution on evidence inadmissible at trial.

Contrary to Mr. Pirani's views, we are not persuaded the question "raised the assumption to the level of an accepted fact, thereby destroying the presumption of innocense that Mr. Pirani constitutionally enjoyed." Appellant's Brief at 22. We are preoccupied here with the manner the question came across to the jury. We suspect the jury understood the question as a hypothetical meant to test the firmness of the witness's opinions, especially when the question trailed eight other hypothetical questions seeking to do the same. At the very least, we are not confident that the question so biased the jury that we are prepared to hold the question cast doubt on the fairness, integrity, or public reputation of the proceeding.

The reference to Mr. Pirani's ownership of the airplane had an even less detrimental effect on the defense. Where a guilt-assuming question offers nothing into the case that was not already before the jury, reversal is not warranted. United States v. Morgan, 554 F.2d 31, 32-34 (2d Cir. 1977). By the time the government asked Ms. Graham whether her opinion would change if she knew Mr. Pirani owned the airplane, the government had already concluded its case in chief, in which it had presented abundant documentary evidence of his interest in the craft. In other words, the government had all but proved Mr. Pirani was an owner of the airplane, and it cannot be said the question added anything to, much less changed the outcome of, the trial. We therefore conclude the district court did not commit plain error when it permitted the prosecution to ask and receive an answer to the guilt-assuming question.

Mr. Pirani next argues the district court erred by allowing the prosecutor to ask questions referring to unproved specific instances of misconduct. Once the defense opens the door by introducing reputation or opinion testimony of the defendant's positive character traits, the prosecution on cross examination may test the proffering witness's knowledge and credibility by inquiring into relevant specific instances of the defendant's misconduct, provided the government has a good-faith basis for believing the misconduct occurred. Fed. R. Evid. 405(a); United States v.

<u>Monteleone</u>, 77 F.3d 1086, 1090 (8th Cir. 1996) (citation omitted).  Mr. Pirani does not take issue with Rule 405(a) or its application in this case, but rather with the district court's failure to follow the procedures we require of district courts which permit specific-acts questions on cross examination.

Because the prosecutor inquires about un-admitted alleged facts injurious to the defendant's character, and the jury may take the character imputations as true, we have warned specific-act cross-examination questions are fraught with risk of prejudice to the defendant.  <u>United States v. Krapp</u>, 815 F.2d 1183, 1186 (8th Cir. 1987); <u>Gross v. United States</u>, 394 F.2d 216, 220 (8th Cir. 1968).  Indeed, unless the questions are circumscribed by rules of fairness and grounded in demonstrated good faith on the part of the prosecution, they can make for a miscarriage of justice.  <u>Id</u>.  To lessen this risk, we have warned the district courts they must conduct a sidebar or preliminary proceeding to satisfy themselves the misconduct has a factual basis.  As we have explained:

> When this sort of . . . question is asked, and the fact inquired about would be injurious to defendant's character and is not otherwise in evidence, preliminary proceedings outside the presence of the jury should be conducted first.  At these proceedings, either in camera or at the bench, the government could privately state its evidence [of the specific instance of the defendant's conduct], defense counsel could argue with the evidence or attempt to rebut it in some way, and the Court could satisfy itself that the government had a reasonable, good-faith basis for asking its question.

<u>Bruguier</u>, 161 F.3d at 1149.  When reviewing this procedural error, we have also scolded the government for asking such perilous questions in the presence of the jury without first consulting the judge:

> [W]e admonish the Assistant United States Attorney for asking [defendant's] character witness about the [defendant's] tax returns in

front of the jury without first raising the matter with the trial judge. Before an attempt at impeachment of a character witness with "did you know" type questions such as this, the trial judge should have the opportunity, out of the hearing of the jury, to rule on the propriety of the questions. By failing to raise the matter first with the trial judge, the Assistant United States Attorney created the risk of mistrial after substantial time had been invested in the trial.

Krapp, 815 F.2d at 1186. In this case, we again sound the clarion call warning district courts and government attorneys in our circuit they put a trial in jeopardy when they fail to meet with defense counsel outside the presence of the jury to discuss the factual basis for the defendant's prior instances of misconduct.

Despite our concerns, we conclude the procedural failure did not substantially prejudice Mr. Pirani, much less so contaminate the trial we should declare it infected with plain error. Under similar circumstances, Bruguier held the failure to hold a proceeding or sidebar did not prejudice the defendant. The court there considered the evidence of guilt, the fact the misconduct could be independently verified, and the fact "there was no reason to think government counsel could not have backed the assertion of good faith." Bruguier, 161 F.3d at 1149-51.

The same considerations are at work in this case. First, the government presented extensive documentary evidence of the fact Mr. Pirani owned the crafts, and investigators testified he denied this fact during an official investigation. Second, the prosecutor's questions referred to prior instances of *public* misconduct (e.g., bragging to another officer he stopped counting at $30,000), conduct that could be easily corroborated by witnesses or documents. Finally, because the misconduct is verifiable, we have no reason to believe government attorneys would seriously compromise their ethical duties by asking questions bereft of a factual basis. Indeed, Mr. Pirani does not argue the government acted in bad faith; he only takes issue with

the process. Accordingly, we conclude the district court did not commit plain error when it failed to follow the procedure called for by our precedent.

## III

Mr. Pirani next argues the district court abused its discretion when it permitted the jury to hear the recorded conversation which he believes was irrelevant and unfairly prejudicial. We review rulings regarding the admission of evidence for a clear abuse of discretion. See Andrews v. Neer, 253 F.3d 1052, 1063 (8th Cir. 2001).

Evidence is relevant if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence. Fed. R. Evid. 401. To meet its burden of proof, the government had to prove Mr. Pirani "knowingly and willfully made a false material statement that was within a government agency's jurisdiction." United States v. Whitaker, 848 F.2d 914, 917 (8th Cir. 1988). The government argues it introduced the tape to show Mr. Pirani knew of the investigation. Mr. Pirani counters the government did not need to show he had prior knowledge to prove the offense. He argues that, if he did own the plane and boat, he could not have said otherwise without acting knowingly and willfully. Thus, the evidence he owned the plane and then denied his ownership to the authorities sufficed to establish every element of the offense and the videotape did not make a material fact any more probable.

Even if his argument has merit, the tape surely has probative value in showing Mr. Pirani made a false statement he knew was *material* to an *investigation*. Without the tape, Mr. Pirani could have argued he lied to the authorities because he thought the lie was immaterial or because he did not know the investigators were on official business. The tape shows that, when the authorities came to interview him, Mr. Pirani knew his response would have a material effect on a matter within the FBI's and IRS's jurisdiction.

-12-

Mr. Pirani also suggests the tape's probative value, if any, was substantially outweighed by the risk of unfair prejudice. See Fed. R. Evid. 403. On the tape, Mr. Pirani and the others are heard swearing expressively in the normal course of a casual conversation among officers culminating in his declaration he has no reason to worry about the investigation. We doubt Mr. Pirani's profane bravado in the context of such roughhouse talk came as a surprise to the jury, much less colored its views of his propensity to break the law. Because the risk of unfair prejudice did not substantially outweigh the tape's probative value, we conclude the district court did not abuse its discretion when it admitted the tape into evidence.

Finding no reversible error in the district court's evidentiary decisions, we affirm the conviction.

IV

Although we affirm the conviction, we reverse the sentence and remand for re-sentencing consistent with Blakely v. Washington, 124 S.Ct. 2531 (2004), the recent landmark decision which has brought a sea change in our understanding of the constitutionality of determinate sentencing systems including the United States Sentencing Guidelines.

Even as we write this opinion, a split panel of this circuit has invalidated the entire Guidelines system as unconstitutional in light of Blakely. United States v. Mooney, No. 02-3388, slip op. (8th Cir. July 23, 2004). Though the mandate in Mooney has yet to issue, we believe the decision represents binding precedent on a matter sure to receive the attention of the Supreme Court or this court en banc, or both, in the near future. See Chambers v. United States, 22 F.3d 939, 942 (9th Cir. 1994) (rejecting the argument filed panel decision is not binding until mandate issues and stating "[i]n this circuit, once a published opinion is filed, it becomes the law of the circuit until withdrawn or reversed by the Supreme Court or an en banc court.")

(vacated on other grounds); cf. Finberg v. Sullivan, 658 F.2d 93, 96 (3d Cir. 1981) (stating issuance of mandate is largely a ministerial function).

Without expressing an opinion regarding the constitutionality of the Guidelines system in its entirety, we hold Blakely extends to the Sentencing Guidelines at least to the extent they require the courts to impose punishment based on judicially found facts.[1] Because the Blakely Court did not address the impact of its decision on the Sentencing Guidelines, we recognize all judicial opinions addressing the impact of Blakely upon the Guidelines depend on a modicum of conjecture as to what the Supreme Court will do if and when it finally addresses the issue, and all are thus part of an unsettled and yet-forming body of law. Under these circumstances, we think it prudent, even if Mooney requires the result we reach, to add our views to the public discourse by publishing the lines of analysis we have followed in reaching the result.

We start with a synopsis of Blakely and its relationship to Apprendi v. New Jersey, 530 U.S. 466 (2000). In Blakely, the defendant entered into a plea agreement stipulating to the fact he had committed second-degree kidnapping with a firearm. According to provisions contained in Washington's criminal code, second-degree kidnapping is a class B felony, that is, a felony within a class of offenses punishable by a period of confinement no longer than 10 years. While these provisions set the 10-year ceiling for the class, another provision specifies a "standard range" of 49 to 53 months for the specific offense of second-degree kidnapping with a firearm. In other words, the standard range limits the maximum sentence a court may impose for the offense to a term well under the statutory ceiling for class B felonies.

---

[1]We only decide the issue squarely before us. Because Mooney has invalidated the entire Guidelines system, we do not examine the question whether the cross reference is severable from the rest of the Guidelines. If Mooney is reversed on severability grounds, then this decision can still stand on the basis this cross reference is severable from the substantive provisions of the Guidelines. See United States v. Ameline, ___ F.3d ___, 2004 WL 1635808, at *28-33 (9th Cir. July 21, 2004).

-14-

This limitation, however, does not mean the class maximum is without purpose, for yet another provision authorizes an "exceptional sentence," or upward departure from the standard range, when the court finds aggravating factors not already used in computing the standard range. The class maximum – what we call "ceiling" for sake of clarity – serves to cap the aggregate sentence a court may impose after increasing the standard-range sentence based on the court's findings of aggravating factors. In Blakely, the sentencing court found the defendant had acted with deliberate cruelty and imposed a sentence of 90 months, 37 months beyond the standard range but still within the 10-year maximum for class B felonies.

Applying the rule of Apprendi,[2] the Supreme Court held the exceptional sentence violated the defendant's right to a jury trial by exceeding the "statutory maximum" based on facts not submitted to the jury or admitted by the defendant. Relying on the widespread understanding of the phrase "statutory maximum," Washington argued the sentence did not run afoul of Apprendi because it did not exceed the statutory maximum for class B felonies. The Court disagreed and explained:

> Our precedents make clear . . . that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of facts reflected in the jury verdict or admitted by the defendant* . . . . In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.

Blakely, 124 S. Ct. at 2537 (emphasis in the original). After Blakely, in other words, the phrase "statutory maximum" refers not to the statutory ceiling for the type of offense but rather the specified sentence for the offense itself – what the Court calls

---

[2]"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490.

the "*relevant* statutory maximum." (Emphasis added). The language of the rule of Apprendi has not changed; what has changed is the understanding of its meaning.

Against this background, we now review Mr. Pirani's challenge to his sentence in the instant case. Because he did not object to the sentence under Apprendi in the district court, we review the sentencing decision for plain error. See United States v. Butler, 238 F.3d 1001 (8th Cir. 2001). Even under this heightened standard, we agree with Mr. Pirani his sentence violates principles underlying the rule of Apprendi when considered in view of Blakely.

First, we must explore the reasons for our belief Blakely applies to sentences imposed under the Sentencing Guidelines. Viewing the framework of the federal sentencing system in juxtaposition with the design of Washington's, the two seem to us analogous. For a charged offense, each system has a determinate, or presumptive, sentencing range (the relevant statutory maximum) operating against the backdrop and within the limits of a statutory ceiling (the statutory maximum). Each also provides for upward adjustments calibrated to specific fact findings made by the sentencing judge by the civil standard of proof, and in each case, these adjustments result in an actual sentence exceeding the presumptive range but still within the limits of the statutory ceiling.

The only distinction we discern between the two arrangements lies in the origin of the presumptive range and its concomitant adjustments – those features of the federal system collectively known as the Sentencing Guidelines. In the federal system, the Guidelines are promulgated by an administrative agency nominally located in the Judicial Branch acting under the authority and direction of Congress, whereas in Washington's system, the standard ranges and exceptions, as well as the statutory ceiling, are embedded directly in statutory law.

-16-

We can discern no significance in such a distinction. As Justice O'Connor explained in her <u>Blakely</u> dissent, "[t]he Guidelines have the force of law . . . and Congress has unfettered control to reject or accept any particular guidelines." <u>Blakely</u>, 124 S. Ct. at 2537 (O'Connor, J., dissenting) (internal citations omitted). Like the Ninth Circuit, we too agree with the Seventh Circuit's observation the pattern of the Guidelines parallels the framework of the Washington statutes, and "it is hard to believe that the fact that the guidelines were promulgated by the U.S. Sentencing Commission rather than by a legislature can make a difference." <u>United States v. Ameline</u>, ___ F.3d ___, 2004 WL 1635808, at \*7 (9th Cir. July 21, 2004) (quoting <u>United States v. Booker</u>, ___ F.3d ___, 2004 WL 1535858, at \*2 (7th Cir. July 9, 2004)). Further, to whatever extent the Guidelines are less expressive of Congress's will than statutory enactments, we think the Guidelines are rather more susceptible to a constitutional challenge than were the statutes in <u>Blakely</u>, for it is difficult to imagine why the Constitution would defer to rules promulgated by an agency where it has not to statutes enacted by a state's legislative branch.

As a result, we agree in principle with the conclusion that <u>Blakely</u> applies to the Sentencing Guidelines, at least insofar as they permit a sentencing judge to sentence a defendant based on judicially found facts. Having reached this conclusion, we now turn to the legality of the § 2F1.1 cross reference in the instant case.

Mr. Pirani was charged with and convicted of making false statements to federal authorities in violation of 18 U.S.C. § 1001. In the 2000 Guidelines Manual, § 2F1.1 covers the offense of making a false statement. Pursuant to § 2F1.1's Application Note 14, however, the district court found the offense of obstruction of justice more aptly covered the facts set forth in the indictment, and so the court cross

referenced to § 2J1.2, the guideline for obstruction of justice.[3]  In effect, Louis F. Pirani was charged with and convicted of one crime but sentenced for another.

The Supreme Court fashioned the rule of <u>Apprendi</u> on the premise sentencing enhancements are the functional equivalents of elements of an offense greater than the one covered by the jury's verdict.  <u>Apprendi</u>, 530 U.S. at 494, n.19.  The Court implied the government should not be allowed, merely by labeling elements as enhancements, to circumvent the constitutional requirement that a jury find all the elements of a crime beyond a reasonable doubt.  Such reasoning, of course, applies with absolute force in this case, for we need not draw an analogy between a challenged departure and statutory elements, as here, the sentencing court made factual findings regarding the elements themselves of another offense. Thus, under the direction of the cross reference, the district court utterly usurped the role of the jury and violated the spirit, if not the letter, of the rule of <u>Apprendi</u>.

To prove a defendant obstructed justice, the government must prove elements distinct from the elements needed to prove the making of false statements.  <u>See</u> 18 U.S.C. § 1512(c)(2) (obstruction); 18 U.S.C. § 1001 (false statements).[4]  Thus, in applying the cross reference, a sentencing court implicitly makes its own finding the government has proved the elements of obstruction, and in doing so, the court assumes the role of the jury, denying the defendant the right to have his peers find beyond a reasonable doubt every fact supporting his punishment. Applying <u>Blakely</u> and <u>Apprendi</u> to the instant case, then, we conclude the § 2F1.1 cross reference

---

[3]With the cross reference, Mr. Pirani's base offense level increased from 6 to 12, resulting in a higher presumptive sentence for the offense of conviction.

[4]A person violates 18 U.S.C. § 1512(c)(2) if he "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so."  A person violates 18 U.S.C. § 1001 if he "knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation" in a matter within the jurisdiction of one of the three branches the United States government.

-18-

violated Mr. Pirani's Sixth Amendment right to a jury trial. Thus, the application of the cross reference was error. See United States v. Henkel, 358 F.3d 1013, 1015 (8th Cir. 2004) (stating an error is a deviation from a legal rule).

Furthermore, we conclude such a deprivation of Mr. Pirani's constitutional right amounted to *plain* error. We are mindful an error cannot be plain unless it is "obvious" or "clear under current law." United States v. Olano, 507 U.S. 725, 734 (1993). Because the circuits are currently split on whether Blakely applies to the Sentencing Guidelines,[5] it may be said the error in this case falls short of the plain-error standard. See United States v. Thompson, 82 F.3d 849, 856 (9th Cir. 1996) (refusing to brand error plain because of uncertainly in the law reflected in circuit split and lack of controlling authority);United States v. Williams, 53 F.3d 769, 772 (6th Cir. 1995) (holding a circuit split precludes a finding of plain error). Even if precedent in our own circuit precluded plain error where there is a circuit split, we would find the argument unpersuasive because it ignores the realities of current affairs.

In creating the circuit split, the Fifth Circuit noted prior Supreme Court cases have repeatedly "blessed" the Sentencing Guidelines. United States v. Pineiro, ___ F.3d ___, 2004 WL 1543170, at *9 (5th Cir. July 12, 2004). The court acknowledged, however, that the view that Blakely invalidates the Guidelines does not contradict those past Supreme Court cases, because none of those cases involved a Sixth Amendment challenge. Id. Accordingly, the Fifth Circuit concluded the view

---

[5]To this date, the Sixth, Seventh, Eighth, and Ninth Circuits as well as the vast majority of district courts, have ruled part or all of Guidelines are unconstitutional under Blakely. See Ameline, 2004 WL 1635808, at *4, n.2 (listing and citing opinions interpreting Blakely). Among the Circuits, only the Fifth has ruled Blakely inapplicable to the Guidelines. See Pineiro, 2004 WL 1543170, at *9. The Sixth Circuit has since vacated the original panel decision after granting the government's petition for a rehearing en banc.

that <u>Blakely</u> invalidates the Guidelines creates an "unsettling tension" between <u>Blakely</u> and the Court's prior cases. <u>Id.</u>

While another circuit's dissenting view might normally restrain us from declaring the current law is clear, we are not so troubled here by the Fifth Circuit's position. The circuit has premised <u>Pineiro</u> on the defensible view we should not ourselves overrule Supreme Court precedent. In other words, it is the "tension" in the Supreme Court's jurisprudence that gives the Fifth Circuit pause, not the substance and import of <u>Blakely</u> itself.

Though we may agree with the Fifth Circuit's view in the abstract, we believe it exalts form over substance under current circumstances. Even without <u>Blakely</u>'s dissenting opinions forecasting the fall of the Guidelines in the lower courts, the <u>Blakely</u> majority did not require the gift of clairvoyance to divine the lower courts would apply its decision to the Guidelines, so parallel is the federal sentencing system with Washington's. As it turns out, the vast majority of courts read <u>Blakely</u> as applicable to the Guidelines, and we cannot read its vigorous defense of the jury's role without reaching the same conclusion. We would not turn a blind eye to a nearly universal reading of <u>Blakely</u> because we feel a duty to preserve for the Supreme Court the privilege of reconciling its decisions. The interaction between the Supreme Court and the lower courts is not so rigidly hierarchical that we cannot, in the appropriate circumstances, attempt to reconcile the Court's precedent ourselves.

As we write, there is a veritable groundswell of opinion regarding the Supreme Court's position on <u>Blakely</u>'s applicability to the Guidelines. In the past two weeks alone, the Second Circuit has certified the question to the Supreme Court,[6] Congress has passed a resolution requesting the Court to resolve the issue, and at least two

---

[6]<u>See</u> <u>United States v. Penaranda</u>, ___ F.3d ___, 2004 WL 1551369 (2d Cir. July 12, 2004).

parties have filed expedited petitions for certiorari. It may be the Supreme Court will let the lower courts work through the tension in its precedent, but if the Court soon adopts the view of the majority of the circuits, there will be no question the error in the instant case contravenes clearly established law. Meanwhile, where the only obstacle standing in the way of vacating Mr. Pirani's sentence is a technical deference to the Supreme Court's right to overrule its precedent, it would be unfair to affirm his sentence only to realize, in due course, that the prevailing reading of <u>Blakely</u> would have afforded him relief.

Properly viewed, <u>Blakely</u> does not announce a new rule of law for the circuit courts to agree or disagree upon, but rather recasts our understanding of the <u>Apprendi</u> rule by clarifying the meaning of the phrase "statutory maximum." Had <u>Apprendi</u> been clear from the beginning in defining the phrase, would anyone argue it means anything other than the *relevant* statutory maximum and applies to the Guidelines? Under appropriate circumstances, we have previously held a violation of <u>Apprendi</u> amounts to reversible plain error. <u>See</u> <u>Butler</u>, 238 F.3d at 1005. In our mind, the cross reference violates the rule of <u>Apprendi</u> as now refined in <u>Blakely</u>, and so the error in this case contravened clearly established law. Thus, the error was plain.

Moreover, it cannot be said the error did not work prejudice upon Mr. Pirani's substantial rights. Perhaps an error more prejudicial to the rights of a defendant cannot be conceived than the denial in whole of his right to litigate the elements of the offense for which he is punished. Mr. Pirani did not receive notice of, much less have an opportunity to contest as such, any evidence tending to prove the elements of obstruction. In other words, he was denied the right to hold the government to its burden of alleging and then proving the elements of obstruction to the jury beyond a reasonable doubt. In a trial that was largely a credibility contest, fraught with the evidentiary issues we have discussed above, it cannot be argued the government's success in securing the § 1001 conviction would have translated into a conviction for obstruction of justice, just because the latter would have been predicated on the same

underlying conduct. We have no doubt the cross reference worked prejudice upon Mr. Pirani's substantial rights.

Finally, where the Supreme Court has so forcefully vindicated the right to have a jury determine the actual or functional elements of an offense, we conclude the cross reference, by directing the judge to usurp the role of the jury, cast doubt upon the fairness of the judicial proceeding. Accordingly, it was reversible plain error to apply the cross reference.

For the reasons stated, we affirm the conviction but reverse the sentence and remand for re-sentencing consistent with this opinion.

SMITH, Circuit Judge, concurring in part, dissenting in part.

I concur in the majority's opinion finding no reversible error in the district court's evidentiary decisions. However, I am unable to join the remainder of the panel's decision. It is my view that the district court's determination that Mr. Pirani's conduct was more correctly classified as an obstruction of justice–as opposed to a false statement–was correct. The majority reverses based on its conclusion that the district court's determination constituted plain error under *Blakely*. I disagree.

At the outset, I am satisfied that the district court–in the pre-*Blakely* landscape–correctly sentenced Mr. Pirani. The applicable Guidelines specify that 2F1.1 is the appropriate Guideline section for a conviction under 18 U.S.C. §1001 (the offense for which Mr. Pirani was convicted). Under 2F1.1, application note 14 states that some cases under 18 U.S.C. §1001 can be prosecuted under more specific statutes. The application note further states that where the indictment establishes an offense more aptly covered by another Guideline, then the more applicable Guideline should be used. I agree with the district court that Mr. Pirani's conduct was more

-22-

appropriately covered by the Guideline for obstruction of justice, which mandated an offense level of 12.

The district court's decision to utilize the more specific Guideline is not without precedent. *See United States v. Kurtz*, 237 F.3d 154 (2d Cir. 2001) (affirming use of application note 14 to justify obstruction enhancement). Here, the indictment set forth the necessary conduct constituting obstruction of justice, and as such, Mr. Pirani's criminal behavior–making false statements to FBI and IRS agents during the course of a government investigation, when Mr. Pirani, himself in law enforcement, knew of the investigation–is more aptly covered by the obstruction of justice enhancement as opposed to the false-statement enhancement.[7]

But what of *Blakely*? Could the district court be correct in its application of the Guidelines, but plainly err by complying with the strictures of the federal-sentencing scheme? The effects of the *Blakely* decision on the ultimate constitutionality of the United States Sentencing Guidelines is anything but clear. How, indeed, can an error be plain, when as the majority eloquently notes, " . . . we recognize all judicial opinions addressing the impact of *Blakely* on the [G]uidelines depend on a modicum of conjecture as to what the Supreme Court will do if and when it finally addresses the issue, and all are thus part of an unsettled and yet-forming body of law"? The majority also notes that "if the Court soon adopts the view of the majority of the circuits, there will be no question the error in the instant case contravenes clearly established law." I agree. But the Court has not done so.

As such, by its own admission, the majority is shooting at a moving target. Although we are unsure of the Court's ultimate position on the constitutionality of the

---

[7]As a secondary point related to prejudice, if Mr. Pirani had been sentenced under U.S.S.G. § 2F1, as he requests on appeal, he could have received an even longer sentence.

federal sentencing legislation, the same cannot be said for the Court's position on plain-error review. The Court has held definitively, "[a]t a minimum, court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). Given the unclear state of the law, as it relates to the Guidelines, I cannot agree that plain error has been shown.

      I therefore respectfully dissent.

_____