**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0268n.06
Filed: April 8, 2009

**No. 07-6380**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CELINA MAY CLAY, | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| Respondent-Appellant. | ) | |

Before: COLE and COOK, Circuit Judges; and EDMUNDS, District Judge.[*]

COOK, Circuit Judge. A jury found Celina May Clay guilty of knowingly making a false statement in connection with a firearm purchase, in violation of 18 U.S.C. § 922(a)(6) (Count 1), and of delivering a firearm and ammunition to a convicted felon, in violation of 18 U.S.C. § 922(d)(1) (Counts 2 and 3). Clay appeals her conviction and sentence, and we affirm.

I. Background

On October 20, 2005, Clay purchased a .38 caliber derringer from a pawn shop in Nashville, Tennessee. The next day, she reported to her shift as a guard at Charles Bass Correctional Complex.

---

[*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

According to the testimony of inmate Clinton Osborne, a maintenance worker with access to all prison cellblocks, Clay gave Osborne a plastic bag containing a jar of peanut butter and a bag of candy, and instructed him to deliver it to another prisoner, David Lane. Osborne claimed that he noticed the unusually heavy weight of the peanut butter jar and opened it, discovering a gun and ammunition wrapped in wax paper within the peanut butter. Osborne hid the gun and ammunition in an air-conditioning duct. He then allegedly returned to Clay's office, where she told him, "he's going to need a couple pieces of sandpaper to get the number off that thing."

The next morning, October 22, Osborne told Corporal Russell Blanton about the gun and ammunition, and that Clay smuggled them inside. Blanton, Shift Captain Pamela Covington, and Tennessee Department of Corrections ("TDOC") investigator John Fisher retrieved the gun—the same gun Clay purchased on October 20—and ammunition. Wax paper with traces of peanut butter surrounded each item. Osborne handed Fisher the bag with the candy, but said that he had thrown out the peanut butter jar.

When Clay arrived that afternoon, Covington led her to an administrative office for questioning. TDOC investigator Jason Woodall testified that he read Clay her *Miranda* rights and advised her that he "had reason to believe that she had information or involvement in the introduction of that weapon into the facility." Clay at first agreed to talk to the investigators, but when Woodall began recording their conversation, Clay mentioned she might want a lawyer. According to Woodall, he terminated the interview and explained that if Clay wanted to speak with

him again, she would have to initiate contact. The investigators sent Clay to a room across the hall, where she waited with Covington for 20–30 minutes. At that point, Clay allegedly told Covington that she wanted to speak to investigators again. Fisher informed Clay that he did not "want to play games," and asked Covington to search Clay before leading her back to the office. Covington's search uncovered a piece of sandpaper in Clay's pocket, which concealed the owner's manual for the gun found in the air-conditioning duct.

Back in the office, Woodall turned on the tape recorder and asked Clay whether anyone had threatened her ("No") and whether she wanted to reinitiate the interview ("I want to be completely cooperative . . . Yes"). Clay signed a waiver of her rights. During the interview, Clay admitted to purchasing the gun, bringing a jar of peanut butter and a bag of candy to work, and intending the gun for Lane. She denied bringing the gun into the prison, claiming she left it in her car. Later that afternoon, in Lane's cell, investigators found a cell phone concealed in a jar of peanut butter. The phone's call log revealed six calls to Clay's home on October 22.

The jury found Clay guilty on all three counts. Following a sentencing hearing, the district court sentenced Clay to 41 months, a sentence within the Guidelines range. Clay appeals her conviction on the grounds that the district court lacked subject matter jurisdiction, that it erred in denying her motions to suppress, to dismiss the indictment, and for a mistrial, and that the evidence failed to sufficiently prove her guilt beyond a reasonable doubt. She also appeals the reasonableness of her sentence.

II. Analysis

A. Conviction Appeal

*1. Subject matter jurisdiction*

Clay urges the court to conclude that the district court lacked subject matter jurisdiction, because 18 U.S.C. § 922(a)(6) and (d)(1) exceed Congress's authority under the Commerce Clause. Precedent, however, establishes the constitutionality of both statutes. *See Huddleston v. United States*, 415 U.S. 814, 833 (1974) ("Congress intended, and properly so, that § 922(a)(6) and (d)(1) . . . were to reach transactions that are wholly intrastate."); *United States v. Rose*, 522 F.3d 710, 717 (6th Cir. 2008) (Section 922(d)(1) "is a proper use of Congress' *Commerce Clause* power.") (italics in original).

*2. Suppression of Clay's statement*

Next, Clay challenges the denial of her motion to suppress her statement to investigators, alleging: (1) the investigators unlawfully detained her, (2) they unlawfully interviewed her after she invoked her right to counsel, and (3) she involuntarily waived her *Miranda* rights. With denials of motions to suppress, "[w]e review the district court's factual findings for clear error and its legal conclusions *de novo*," viewing all evidence in the light most favorable to the government. *United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008).

First, Clay argues that the district court should have suppressed her statement as the fruit of an unlawful detention. There are "three categories of police-citizen encounters: (1) an arrest which requires probable cause pursuant to the Fourth Amendment; (2) an investigatory stop which is a limited, non-intrusive detention and requires reasonable suspicion based on articulable facts, *i.e.* the classic *Terry* stop; and (3) consensual encounters where an officer seeks voluntary cooperation of a citizen and requires no suspicion at all . . . ." *United States v. Dotson*, 49 F.3d 227, 230 (6th Cir. 1995). The scope of a *Terry* stop "must be limited to 'the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time,'" *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)), and the test is whether "a reasonable person in the defendant's position [would] have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way." *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991) (citations omitted).

When Clay arrived at work on the day that Osborne reported the gun, a correctional officer escorted her to a conference room for questioning by two agents from the TDOC's internal affairs department. The investigators gave Clay *Miranda* warnings, told her that a gun had been found in the prison, and began to question her about whether she had been involved. According to one agent's later testimony at trial, Clay quickly admitted that she had recently purchased a gun. *See United States v. Hardin*, 539 F.3d 404, 417 (6th Cir. 2008) ("[I]n reviewing the denial of the [suppression] motion, we may consider trial evidence in addition to the evidence admitted at the suppression hearing."). Clay's admission was made in the first fifteen-to-twenty minutes of the

interview, before the agents turned on the tape-recorder. The agent's testimony at trial is consistent with his remark to Clay in the tape-recorded portion of the interrogation that, "You told me earlier, prior to us going on this tape, that you . . . uh . . . purchased two days ago, a Derringer Pistol . . . for $160 dollars [sic], is that right?" Clay responded, "That's correct." This admission clearly gave the agents probable cause to suspect Clay.

At the point when Clay initially admitted purchasing the gun, the encounter was only an investigatory interview, not an arrest. There was no evidence of coercion, and the questioning had only been taking place for a short time in the relatively non-threatening environment of a conference room at Clay's workplace. The scope and nature of the interview was entirely reasonable given that a gun had been found in the prison in an area where Clay had worked. *See United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (if reasonable suspicion exists, police may engage in brief investigatory detention using the least intrusive means reasonably available). The fact that Clay was read *Miranda* warnings did not automatically convert the encounter into an arrest. *See United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994). Because the encounter was still an investigatory *Terry* stop when Clay provided additional incriminating statements giving rise to probable cause, any subsequent arrest that may have occurred was lawful.

Second, Clay contends that investigators violated her Fifth Amendment rights by interrogating her after she invoked her right to counsel. Once a suspect invokes her right to counsel, she may not be "subject to further interrogation by the authorities until counsel has been made

available to [her], unless the accused [her]self initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Clay acknowledges that, after her initial request for counsel, she asked: "do you think I can talk to them again?" But she maintains that her inquiry did not constitute a request to resume the interview. She relies on *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), where the Supreme Court noted that "[t]here are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating . . . to the investigation." *Id*. at 1045.

But Clay's inquiry was not "merely a necessary inquiry arising out of the incidents of the custodial relationship," such as the request for water or to use the phone. *Id*. at 1046. And in *Bradshaw*, the Court found the question "Well, what is going to happen to me now?" sufficient to initiate communication with investigators because, even if ambiguous, it "evinced a willingness and a desire for generalized discussion about the investigation." *Id*. at 1045–46. Here, Clay asked to talk to the investigators again—the word "again" suggesting a resumption of their prior discussion. Her inquiry "could reasonably have been interpreted by the officer as relating generally to the investigation." *Id*. at 1046. And, similar to *Bradshaw*, Agent Woodall's actions suggested he viewed Clay's question in this manner; he asked her to confirm that she wanted to reinitiate the interview before he continued the interrogation. *See id*. Accordingly, we reject Clay's argument.

Third, Clay presses that, even if she waived her rights to counsel and to silence, the waiver was not "knowing and intelligent" as required under *Edwards* because investigators coerced her. *See Bradshaw*, 462 U.S. at 1046 (quoting *Edwards*, 451 U.S. at 486 n.9). In order to prevail, Clay must prove that: "(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was, in fact, overborne as a result of the coercive police activity." *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

Here, in concluding that Clay knowingly and intelligently waived her rights, the district court found: (i) "[t]here was no threatening behavior," (ii) Clay had the ability to say "no" and exercised that ability during the interviews, (iii) she is well-educated, with a doctorate in education, (iv) she is over 50 years old, (v) investigators interviewed her at work, a familiar environment, and (vi) the length of her interview was not abusive. Clay claims that Agent Woodall coerced her by falsely asserting that the paper surrounding the pistol contained her fingerprints, but this court held in an analogous factual situation that investigators did not overbear a defendant's will "simply because he [was] led to believe that the government's knowledge of his guilt [was] greater than it actually [was]." *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994).

Citing the testimony of her forensic psychology expert, Clay further argues that she "was sleep deprived" and "highly vulnerable to pressure and manipulation" during the interrogation. But the district judge accounted for this testimony, concluding that the investigators did not overcome

Clay's will, and we defer to a trial court's factual findings, "based as they are upon the trial court's firsthand observation of the witnesses to the events involved," *Bradshaw*, 462 U.S. at 1046–47. Clay fails to show that these findings are clearly erroneous. *See id.*; *see also United States v. Ostrander*, 411 F.3d 684, 696–97 (6th Cir. 2005).

Because (1) probable cause supported Clay's arrest, (2) the investigators did not violate *Edwards*, and (3) Clay knowingly and intelligently waived her rights to silence and to counsel, we conclude that the district court did not err in denying the motion to suppress her statement.

*3. Failure to preserve exculpatory evidence*

Clay asserts that the district court should have dismissed the indictment because the government failed to preserve the peanut butter jar as evidence. This court reviews de novo denials of motions to dismiss an indictment on such grounds. *See United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001). In order to demonstrate that the government violated her due process rights, Clay must show: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means." *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002).

This case does not present a situation where the government possessed evidence but later lost or destroyed it. *See, e.g.*, *id.*; *Wright*, 260 F.3d at 571. Rather, here the government never

successfully located the evidence at issue. Osborne, after correctly identifying the hiding place of the gun and ammunition, indicated that he disposed of the peanut butter jar in the prison's trash. The investigators searched that building's dumpster, but could not find the jar. Clay insists that the government did not "adequately search" for the jar, but the court disagreed, finding that the investigators tried to locate the jar, and Clay offers no evidence that the government acted in bad faith. And even "[w]hen the government is negligent, or even grossly negligent, in failing to preserve potentially exculpatory evidence, bad faith is not established." *Monzo*, 281 F.3d at 580. The district court properly denied Clay's motion to dismiss the indictment.

*4. Introduction of hearsay statement*

Clay next contends that the use of testimonial hearsay at trial violated her confrontation rights under the Sixth Amendment, and that the district court erred in denying her motion for a mistrial. We review for an abuse of discretion. *United States v. Macias*, 387 F.3d 509, 515 (6th Cir. 2004).

The alleged violation stemmed from defense counsel's cross-examination of Agent Fisher. After questioning Fisher about the experiments he conducted melting peanut butter to conceal objects, defense counsel asked: "And you did all of that because that's the way Mr. Osborne described it to you, right?" Fisher responded: "No. I did that because Inmate Lane said that's how he had instructed Ms. Clay to do it, so I wanted to see if that was the way it worked." The jury

laughed at this response. The district court denied Clay's motion for a mistrial, but instructed the jury to disregard Fisher's statement.

In considering whether to grant a mistrial, the court "is primarily concerned with fairness to the accused," and "the subsequent striking of erroneously admitted evidence accompanied by a clear and positive instruction to the jury to disregard it cures the error unless the stricken evidence is so prejudicial that its harmful effect cannot be eliminated." *United States v. Talley*, 164 F.3d 989, 1002 (6th Cir. 1999) (internal quotation marks omitted).

In *United States v. Harris*, 165 F.3d 1062 (6th Cir. 1999), this court concluded that the district court did not abuse its discretion in denying a motion for a mistrial where: "it does not appear that the government intentionally elicited the reference to defendant Harris' prior arrest; the government's line of questioning was reasonable; the district court gave an immediate and clear limiting instruction; the isolated allusion to the prior arrest was not part of a pattern indicative of bad faith; and the officer's stray remark constituted only a minuscule part of the evidence against Mr. Harris." *Id.* at 1066 (citing *United States v. Hernandez*, 873 F.2d 925, 927–28 (6th Cir. 1989)).

Here, not only did the government not "intentionally elicit" Fisher's comment, defense counsel's own questioning prompted the hearsay statement. Clay offers no evidence of bad faith on the government's part. The district court instructed the jury to disregard Fisher's comment, and, as in *Harris*, the remark represented "only a minuscule part" of the evidence against the defendant. The district court did not abuse its discretion in denying Clay's motion for a mistrial.

5. *Sufficiency of the evidence*

Clay presses that the evidence was insufficient to establish her guilt beyond a reasonable doubt. On review, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and we "will reverse . . . only if this judgment is not supported by substantial and competent evidence upon the record as a whole," *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984). Clay avers that the jury's verdict relied on Osborne's "demonstrably false testimony," but we do not "assess the credibility of the witnesses, or substitute [its] judgment for that of the jury." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (quoting *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994)). Moreover, in addition to Osborne's testimony, the evidence included the following: (i) Clay purchased a gun that investigators found less than two days later in an air-conditioning duct in the prison cellblock where Clay worked; (ii) Clay confessed to intending the gun for Lane; (iii) Six calls were made from Lane's cell phone to Clay's home on the day investigators recovered the gun; and (iv) investigators discovered sandpaper concealing the owner's manual for the gun on Clay's person the day after locating the gun. This evidence sufficiently supports conviction under §§ 922(a)(6) and (d)(1). *See id*.

B.  Reasonableness of Clay's Sentence

We now turn to the reasonableness of Clay's sentence.

*1. Enhancement under U.S.S.G. § 2K2.1(b)(6)*

Clay first asserts that the district court erred by applying a four-point enhancement to her sentence because she possessed a firearm and ammunition "in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6). We review the district court's factual findings for clear error and its application of the Guidelines de novo. *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). Tennessee law provides that it is unlawful to "[k]nowingly and with unlawful intent take, send or otherwise cause to be taken into any penal institution where prisoners are quartered or under custodial supervision any weapons, [or] ammunition . . . ." TENN. CODE ANN. § 39-16-201(b)(1). Clay argues that an enhancement based on this Tennessee law constitutes double-counting, because the indictment charged her with delivering a firearm and ammunition inside a prison. But the district court properly applied the enhancement.

In *United States v. Sanders*, 162 F.3d 396 (6th Cir. 1998), this court interpreted the term "another felony offense" as requiring either "a separation of time between the offense of conviction and the other felony offense," or "a distinction of conduct." *Id*. at 400. Our case meets both criteria. First, a distinction of conduct exists, because the relevant portions of § 922(d)(1) prohibit persons from "dispos[ing] of firearms or ammunition to any person knowing or having reasonable cause to believe that such person . . . has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year"—but does not prohibit the taking of weapons or ammunition into a prison. Second, there is a separation of time between the two offenses: Clay first violated the state

statute by bringing the gun and ammunition into the prison, then subsequently violated § 922(d)(1) by delivering the items to a convicted felon. The district court did not err.

*2. Enhancement under U.S.S.G. § 3B1.3*

Clay also objects to the enhancement for abuse of a position of trust "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Citing to an application note in the Guidelines defining "public or private trust," she maintains that her position as a first-year correctional officer does not qualify as "a position . . . characterized by professional or managerial discretion." § 3B1.3 cmt. n.1. The district court, rejecting Clay's argument, stated that "[a]lthough Ms. Clay may not have had supervisory authority generally over other guards, there was a large amount of trust placed in her for the care and custody and control of inmates and trust vested in the public to safeguard the public."

Our case law affirms this viewpoint. In *United States v. Gilliam*, 315 F.3d 614 (6th Cir. 2003), this court, applying § 3B1.3 to a prison's drug counselor, designated a prison guard as an example of an employee "who occupies a position of trust relative to society at large." *Id*. at 618; *see also id*. (noting that the public has a "legitimate expectation" that "prison custodians will not engage in criminal conduct with inmates" and "places tremendous trust" in such employees); *United States v. Brogan*, 238 F.3d 780, 783 (6th Cir. 2001) (observing that a primary goal of § 3B1.3 is "the necessary faith citizens must have in government for a well functioning republic"). The district court properly applied this enhancement.

*3. Section 3553(a) factors*

Finally, Clay argues that her sentence is unreasonable because the district court imposed a sentence "greater than necessary." *See* 18 U.S.C. § 3553(a). We review the reasonableness of a defendant's sentence for abuse of discretion. *Jeross*, 521 F.3d at 569. The district court need not "explicitly consider each of the § 3553(a) factors . . . . Instead, the record must demonstrate that the sentencing court addressed the relevant factors in reaching its conclusion." *United States v. Duane*, 533 F.3d 441, 452 (6th Cir. 2008) (internal quotation marks omitted). Because the district court sentenced Clay within the Guidelines range, "a rebuttable presumption of reasonableness attaches." *Id*. at 453.

Clay contends that, in balancing the § 3553 factors, the district court "failed to give sufficient consideration" to her history and characteristics. *See* § 3553(a)(1). But the district court explicitly took into account each of the factors delineated in Clay's brief, concluding that "[o]n balance . . . the nature of the offense . . . outweighs any mitigating factors under Section 3553 and that a variance below the advisory guideline range is not appropriate." Clay merely rehashes these factors and asserts that the court should have balanced them differently. We conclude that the district court did not abuse its discretion in sentencing Clay. *See, e.g.*, *United States v. Mayberry*, 540 F.3d 506, 518–19 (6th Cir. 2008).

III. Conclusion


We affirm Clay's conviction and sentence.